272 So.2d 448 (1973)
Juanita D. BRYANT, Plaintiff-Appellant,
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY et al., Defendants-Appellees.
No. 11986.
Court of Appeal of Louisiana, Second Circuit.
January 9, 1973.
*449 Massey & Robinson by John S. C. Massey, West Monroe, for plaintiff-appellant.
Hayes, Harkey, Smith & Cascio by Haynes L. Harkey, Jr., Monroe, for defendants-appellees.
Before AYRES, BOLIN and PRICE, JJ.
BOLIN, Judge.
Juanita D. Bryant brought this malpractice action against Dr. Frank P. Rizzo, Sr., Dr. Frank P. Rizzo, Jr., and St. Paul Fire and Marine Insurance Company, their liability insurer, for damages for alleged negligence on the part of the doctors who, while performing a hysterectomy, inadvertently severed her ureter which resulted in the loss of plaintiff's right kidney. Following trial by jury, a verdict was rendered in favor of defendant, and, from a formal judgment signed in conformance with the verdict, plaintiff appeals. For reasons *450 hereinafter expressed we affirm the judgment of the lower court.
On appeal plaintiff contends a new trial should have been granted based on the following errors allegedly committed by the trial judge: in failing to hold that the verdict of the jury was contrary to the law and evidence; in charging the jury in misleading terms which made it impossible for the jury to comprehend the applicable law; in failing to sustain plaintiff's objections to the charge and to grant special charges to the jury tendered by plaintiff; in failing to permit the jury to review the exhibits offered by plaintiff during the course of the trial; in failing to properly charge the jury on the law of lack of consent and battery; in failing to find that one of the jurors was disqualified as biased, unfair and prejudiced; and in failing to permit jurors to take general instructions to the jury room during deliberations.
Plaintiff, who had been a patient of Dr. Rizzo, Sr., for many years, went to him on August 27, 1970 for a routine medical examination. During the course of this examination a "Pap" test was performed which revealed the presence of abnormal cells. Subsequently a biopsy was done which reflected plaintiff had cancer of the cervix, diagnosed as Stage One, Grade Three. Stage One denotes the malignancy was restricted to the area of the cervix. Grade Three meant the cancerous cells were growing rather rapidly and spreading. Plaintiff was referred to a radiologist who treated her with cobalt for a period of several weeks, after which she was admitted to the hospital for three days to have radium applied directly to the affected area. Six weeks after the completion of the radiation therapy Mrs. Bryant was hospitalized for a modified radical hysterectomy which was performed by Doctors Rizzo, Senior and Junior.
During the course of the surgery Dr. Rizzo, Sr., was stationed to the left of the operating table and Dr. Rizzo, Jr., to the right. During the surgery Dr. Rizzo, Jr., inadvertently placed clamps around plaintiff's right ureter and severed the organ which is a tube connecting the kidney to the bladder. This injury was immediately noted by both doctors and Dr. Paul R. Tennis, a urologist who was present in the hospital, was called. He came immediately to the operating room and attempted to repair or reconstruct the ureter by trimming the severed ends of the tube and sewing them together. The surgery was then finished, the abdomen closed and the patient was taken back to her hospital room.
Within a few days Dr. Tennis noticed fluid leaking from plaintiff's vagina, indicating to him the attempted repair of the ureter was unsuccessful, and he advised plaintiff another operation would be necessary in order to correct the leakage. He concluded the best procedure was to remove the right kidney. He discussed this with plaintiff and explained to her that if the ureter did not properly heal it would be possible to attempt another operation but, in his opinion, the best thing to do was to remove the right kidney. This advice was given because he considered plaintiff physically unable to undergo a second operative attempt to repair the ureter. Plaintiff agreed with Dr. Tennis and consented for him to do what he thought best. Seventeen days after the original surgery Dr. Tennis removed plaintiff's right kidney and she has had a rather uneventful recovery.
Dr. Dickenhorst, the radiologist, testified tests made by him at the time of the hysterectomy and subsequent thereto showed no evidence of malignancy.
Addressing ourselves first to the question of whether the injuries, and consequent damage, to plaintiff were caused by the fault of defendant doctors, we resort first to Louisiana Civil Code Article 2315 et seq., the primary source of all tort liability in Louisiana; and next to the infinite number and variety of cases and articles written on the subject. In determining fault our courts have utilized numerous doctrines and tests in an effort to determine if the *451 alleged tort feasor used the care required of him under the peculiar circumstances surrounding each individual case.
Counsel for plaintiff, in brief before this court, have correctly set forth the underlying principle of law relating to malpractice suits against physicians, which is stated in Meyer v. St. Paul-Mercury Indemnity Company, 225 La. 618, 73 So.2d 781 (1954), wherein it was held:
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. Stern v. Lanng, 106 La. 738, 31 So. 303; Roark v. Peters, 162 La. Ill, 110 So. 106; Comeaux v. Miles, 9 La.App. 66, 118 So. 786; Freche v. Mary, La.App., 16 So.2d 213; Brashears v. Peak, La.App., 19 So.2d 901; Wells v. McGehee, La.App., 39 So.2d 196. See also 70 C.J.S. Physicians and Surgeons § 41."
Our courts have held the doctrine of res ipsa loquitur is not generally applicable in a malpractice case against physicians. However, when some unusual event occurs during an operation, which does not ordinarily occur without some negligence on the part of the doctor, this unusual event casts upon the physician the burden of proving his freedom from negligence. Miller v. United States Fidelity & Guaranty Co., (La.App. 2d Cir. 1972) 260 So.2d 755, and cases cited therein. We conclude the severing of plaintiff's ureter during a modified radical hysterectomy was such an unsual event, placing the burden upon defendant doctors to prove they were not negligent.
On the question of fault most of the voluminous testimony in the trial below was given by physicians who specialized in surgery. We have studied the record diligently but, in writing this opinion, we deem it unnecessary to review the testimony in detail, although we shall attempt a summation of the relevant medical opinions.
Plaintiff first introduced as her witness Dr. H. S. Coon, an eminent general surgeon who had practiced in the area for approximately 40 years. He said he had performed several hundred hysterectomies and did not remember having severed the ureter in any of these operations. He outlined the difference in an ordinary hysterectomy and a modified radical hysterectomy, pointing out the latter required the surgeon to remove most tissue in and around the uterus because of the malignancy. It was his opinion that a surgeon performing this type of hysterectomy was more likely to accidentally sever a ureter than in an ordinary hysterectomy. In his opinion he said he had just been "plain lucky" in not having such an accident himself. He testified he considered the procedure of treating a malignant cervix by cobalt and radium followed by a modified radical hysterectomy was the best procedure for plaintiff's case.
Dr. Tennis, the urologist who made an unsuccessful repair of the ureter and later removed the right kidney, described the operation [modified radical hysterectomy] as being the best procedure to be followed under the circumstances existing in the instant case. He did not express an opinion about the question of negligence in severing the ureter because this was not in his field of medicine.
Dr. Dickenhorst, the radiologist, testified that the method of treating cancer patients with cobalt and radium followed by a hysterectomy was the acceptable method of treatment.
Defendants offered testimony of Dr. Richard Vines, an obstetrician and gynecologist who had been practicing in Monroe *452 for more than fifteen years. He said he had performed several hundred hysterectomies and that it was not the usual thing for a ureter to be damaged or severed during such an operation. However, it was his opinion that it was more likely to happen where a cancerous condition existed and the patient had been treated with cobalt and radium. He said the possibility of injuring the ureter was increased because it was difficult and inadvisable to dissect or "strip" the ureter from the surrounding tissue.
Dr. Fred W. Sartor, a general surgeon who had been practicing in Monroe for approximately twenty years, also testified that he had performed several hundred hysterectomies, of which probably thirty were of the modified radical type. He made an excellent witness, particularly in describing the procedure followed in this type operation. He normally operated as a team in major surgery, with an assistant who performed about the same duties as he. He thought it was proper for the assistant to open the abdomen and perform any part of the surgery as long as the principal doctor was present and in charge. He had examined the charts and other data relating to the operation on plaintiff and was familiar with her diagnosis and treatment. He personally had never severed a ureter during an operation but said statistics reflected injury in approximately twelve per cent of the cases where an operation was performed involving malignancy in the cervix. He said he would not have attempted to dissect or "strip" the ureter in this particular case. In his words the problem existed in the lower two or three inches of the ureter which "literally dives into a connective tissue, extremely vascular tissue which completely surrounds it and it disappears from sight". In this vascular tissue are located the veins that supply the ureter with the major portion of the blood. He testified in the subject operation it is necessary for the surgeon, in order to control the bleeding, to clamp this tissue and, in so doing, risk the possibility of clamping and severing the ureter.
Dr. George Andrew Varino, an obstetrician and gynecologist with more than thirty years practice, estimated he had performed approximately 1500 hysterectomies. His testimony with reference to the method of treatment and the operation for this paricular case was similar to and consistent with that of the other doctors. He did not recommend dissecting the ureter completely out of its vascular bed all the way from the kidney to the bladder where the patient had previously been treated with cobalt and radium. If the ureter is not dissected so as to become completely visible, he testified it is possible and probable that it would be slightly out of place with very little room to work around it, and if it was clamped and severed he would be unwilling to say that such would constitute a standard of care below that required of a qualified expert in the field.
Defendant Dr. Rizzo, Sr., was 69 years of age at the time of trial and had been practicing as a general surgeon since 1927. His testimony consists of 65 pages in the transcript of evidence. He said he and Juanita Bryant were personal friends and she had been his patient for many years. After the biopsy revealed the malignancy in her cervix he said he discussed it with her and recommended the treatment which has been heretofore outlined. She selected Dr. Dickenhorst as the radiologist and also consented to the modified radical hysterectomy. He was definite in his testimony that he told her his son would assist him in the operation. He said he explained to her in general terms the dangers of the operation but did not go into detail about the possibility of injuring the ureter because, in his opinion, this would unduly alarm the patient.
In retrospect he thought the ureter was inadvertently severed because it was not visible where it was attached to the vascular bed and tissues surrounding it. In a normal hysterectomy both ureters are dissected and made clearly visible. He was present during all of the operation and it was evident to him that the right ureter was slightly misplaced and was not getting *453 the normal supply of blood because of the damage to the surrounding tissue and cells resulting from the radium treatment. For this reason it was inadvertently clamped. After this was discovered a urologist was immediately summoned and the procedures outlined hereinbefore were taken. He said the severing of the ureter was an extremely unforunate event and had caused him much concern, particularly because plaintiff was a personal friend of his. However, he said that when a patient has a cancer in that area of her body it is a risky situation and he did the best he could, which he thought was the best anyone could have done under the circumstances.
Dr. Rizzo, Junior also testified on his own behalf and he related his experience, which consisted of four years special training in surgery at the Oschner Foundation Hospital in New Orleans, two years general surgery with the United States Army Medical Corps, and private practice with his father since October 1968. He said he had participated in between 75 and 100 hysterectomies. His testimony was essentially the same as that of his father.
Summarizing the medical testimony, we find no physician testified defendant doctors failed to exercise the degree of skill ordinarily employed under similar circumstances by members of their profession in good standing in the Monroe area; or that they failed to use reasonable care and diligence along with their best judgment in the application of their skill to this case. To the contrary we find defendants have met the burden of proving their lack of negligence or fault under Louisiana Civil Code Article 2315.
We next consider the question of whether plaintiff consented to the surgery performed upon her. The general rule in this state is that absent an emergency a patient's consent is a prerequisite to a surgical operation by his physician. Wells v. McGehee, 39 So.2d 196 (La.App. 1st Cir. 1949); Rogers v. Lumbermens Mutual Casualty Company, 119 So.2d 649 (La.App. 2d Cir. 1960). Consent may be either express or implied. Carroll v. Chapman, 139 So.2d 61 (La.App. 2d Cir. 1962). In this case we find plaintiff gave both oral and written consent to the operation, by telling Dr. Rizzo, Sr., she consented to the hysterectomy and by executing the written admission form when she entered the hospital. We find her consent to this operation included her consent for the surgeon to perform whatever was necessary to remove the potentially cancerous tissues. We make this finding with the full realization that there is some conflict in the testimony on this material fact.
The final issue relates to whether the case should be remanded for a new trial on the grounds that (1) the jury was denied the right to examine certain exhibits during the course of the trial; (2) the plaintiff was required to accept a prejudiced juror and (3) the court did not properly charge the jury.
We find no merit in the motion to remand primarily because plaintiff's contentions are not well founded and, additionally, because our review of the record convinces us the judgment is supported by the law and the evidence.
During trial plaintiff offered into evidence twenty-five exhibits consisting principally of seventy-five pages of hospital records and requested the court to permit the jurors to examine the exhibits during the course of the trial. The court denied plaintiff's request but ruled, and so instructed the jury, that the attorneys in arguing their case could refer to the documents; that if any of the jurors desired to examine the documents during the deliberations the court would permit same upon request. In effect the court simply ruled no useful purpose would be served by passing the complicated documents among the jurors, but that the exhibits would be made available to them upon simple request. Appellant has cited us to no authority for the contention that this ruling was contrary to law or prejudicial and we find no error in the court's ruling on this point.
*454 Appellant's charge that she was required to accept a prejudiced juror stems from the service of the juror John Ukele. The jury was examined on voir dire in general by the court and afterwards the attorneys were permitted to question the prospective jurors. Among the general questions asked was whether any of them had ever been a plaintiff or a defendant in a lawsuit. Ukele replied in the affirmative and upon further questioning stated that he had been a defendant in an automobile accident case. Nothing further was said about the suit by counsel for plaintiff during the examination of this juror. Upon a motion for a new trial testimony was elicited from Mr. Ukele that he had been a defendant in a suit brought by a finance company for which plaintiff's counsel was attorney. Ukele testified he had forgotten about the finance company suit; that he had never met plaintiff's attorney and did not identify him in any way with that litigation. Plaintiff's counsel had every opportunity to examine Ukele at the proper time and the later disclosure about an insignificant lawsuit has not been shown to have been a material factor in the juror's decision. We find no prejudicial error was committed in the service of Ukele on this jury.
The final allegation of error relating to the jury is directed at the judge's charge. The principal complaint is that the judge did not charge the jury about the applicability of the evidentiary rule of res ipsa loquitur. Our study of the judge's charge to the jury as a whole convinces us it correctly acquainted the jurors with the law applicable to the case. Included in the charge was the law applicable to malpractice cases, which has been previously set forth in this opinion, including the rule relative to the shifting of the burden of proof to the defendant doctors in the instant case. In Bush v. St. Paul Fire & Marine Insurance Company, 264 So.2d 717 (La.App. 1st Cir. 1972), it was said:
"... Adequate instructions are those instructions which fairly and reasonably point up the issues presented by the pleadings and evidence and which provide correct principles of law for the jury's application thereto...."
The instructions given by the trial judge in this case met this test.
Assuming there were errors relating to the composition of and charges to the jury, this court has the constitutional duty to review both the law and the facts and if we find the record supports the judgment we should affirm it rather than remand the case for a new trial which would merely cause undue delays and expenses.
Our painstaking review of all the testimony, pleadings and exhibits convinces us that the judgment of the lower court is correct and accordingly it is affirmed at appellant's cost.