11 MURRAY, Judge.
This is an appeal by Dr. Joseph Licciardi, Jr. and his liability insurer from an adverse jury verdict and judgment awarding $67,-000.00 in damages to Amanda and Laura Torbert in a medical malpractice action. The Torberts answered the appeal seeking an increase in the damage awards.
The defendant doctor argues that the patient, Amanda Torbert, and her mother, Laura Torbert (who sued for loss of consortium), failed to prove that he deviated below the acceptable standard of care because there was no medical testimony to that effect.
The facts giving rise to these claims are not in dispute. Amanda Torbert was thirteen years old when she broke her arm while riding a bicycle on July 10, 1985.[1] On her *1214 pediatrician’s recommendation, Mrs. Torbert took Amanda to Southern Baptist Hospital to be seen and treated by Dr. Joseph Licciardi, Jr. Xjrays2 of the injured arm showed that both the radius and ulna were broken. After aligning the broken bones, Dr. Licciardi applied a plaster cast. X-rays taken after the cast was applied showed acceptable alignment. Amanda was given pain medication, and she and her mother were instructed on caring for the arm: there was to be no horseplay and the cast was not to get wet.
Amanda was again seen by the defendant nine days later, on July 19, 1985. X-rays taken on that visit showed that the bones had not moved. Amanda and Mrs. Torbert testified that they thought the cast looked loose and asked the doctor whether he was going to replace it. Dr. Licciardi examined the cast and advised that since it was satisfactory he was not going to change it.
On July 31, 1985, twelve days later, and twenty-one days after Amanda’s arm was broken and put in a cast, she again was seen by the defendant. X-rays taken on that date showed that the fracture had angulated five to ten degrees. Once again, Amanda and Mrs. Torbert questioned the doctor about changing the cast because it was loose. Once again, the doctor examined the cast, pronounced it satisfactory, and advised that he was not going to change it.
At this visit, Dr. Licciardi told Mrs. Tor-bert that Amanda should return for a followup visit in two weeks. However, when Mrs. Torbert was scheduling the next visit at the appointment desk she asked if Amanda could return in three weeks, instead of two, because the family planned to be on vacation at Astroworld in Houston in two weeks. She also asked if the doctor should be consulted about this request. She was told that it would be alright to schedule the return visit in three weeks, and that it was not necessary to consult the doctor.
The plaintiffs testified that Amanda Tor-bert did not go on any of the rides or engage in any rough activity while at Astroworld. She went in the hotel | ¾swimming pool but wrapped her injured arm in a large plastic bag to keep the cast dry.
On August 21, 1985, three weeks after the previous doctor visit, and six weeks after her arm was broken and put into a cast, Amanda Torbert returned to see Dr. Licciardi and he removed the cast. It was immediately apparent that the broken bones were now an-gulated fifteen to twenty degrees so that Amanda’s forearm was deformed.
Dr. Licciardi advised Amanda and her mother that it was possible that the forearm would straighten out on its own. That is, the bones might get into proper alignment without any treatment. He also advised them that surgery might be necessary to restore the bones to proper alignment.
Mrs. Torbert consulted Dr. Ray Haddad, a board-certified orthopedic surgeon, who operated on Amanda’s arm. The surgery, which was done under general anesthesia, required making one incision on the top of the forearm and another on the bottom, and attaching two small metal plates to the broken bones with several metal screws. Later, after the arm had healed, Dr. Haddad operated on Amanda a second time, on an outpatient basis, to remove the plates and screws.
The plaintiffs brought suit against Dr. Lic-ciardi. The matter was referred to a medical review panel comprised of three board-certified orthopedic surgeons who reviewed the medical records, x-rays, and Dr. Licciardi’s position paper. The panel members determined that the doctor had not deviated below the standard of care and that his conduct was not a factor in any damages suffered by Amanda Torbert.
pThe case eventually was tried to a jury, which found that Dr. Licciardi had breached the standard of care and that his negligence proximately caused the injury to Amanda. The jury awarded $65,000.00 in unspecified damages to Amanda Torbert and $2,000.00 damages to Mrs. Torbert for her loss of consortium. This appeal followed.
STANDARD OF CARE:
The defendants argue that the plaintiff in a medical malpractice case has the burden of producing expert testimony to show that the defendant doctor violated the standard of care. Since no expert testified that Dr. Lie- *1215 eiardi deviated from the standard of care, they contend that the plaintiffs have not borne their burden of proof. The plaintiffs respond that it is not always necessary for the plaintiff in a medical malpractice action to produce such expert testimony. The Supreme Court clarified this point in Pfiffner v. Correa, 94-0924, 94-0963, 94-0992, p. 9-10 (La. 10-17-94), 643 So.2d 1228,1234:
We hold that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794’s requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician’s conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care and there is objective evidence, including the testimony of the defendant/physieian, which demonstrates a breach thereof.
While the defendant is correct that no expert specifically testified that “this is the standard of care, and Dr. Liceiardi’s deviation from that standard caused Amanda Tor-bert harm,” there was ample testimony from all the experts to [sestablish the standard of care, and evidence from which the jury reasonably could conclude that Dr. Lieeiardi breached that standard.
The plaintiffs presented the testimony of Dr. Raul Reyes, a board-certified general surgeon with certain training and. experience in orthopedics[2], as well as the deposition testimony of Dr. Haddad, who had passed away by the time of trial.
The defense presented the testimony of Dr. Stuart Phillips and the deposition testimony of Dr. Harold M. Stokes, two members of the medical review panel.[3] Dr. Lieeiardi, who is a board-certified orthopedic surgeon, and the only doctor who actually saw the cast on Amanda, also testified in his own behalf.
All of the various doctors, including the defendant, were in agreement on many points. All agreed that a primary purpose of a cast in a fracture of this type (fracture of both the radius and ulna) is to immobilize the broken bones in a position of acceptable alignment while the arm heals. All agreed that this type of fracture is highly unstable, and misalignment is a common complication. Because of this possibility, the experts agreed that the patient must be followed closely. The experts also agreed that swelling, which can occur several days after an arm breaks, will make the cast tighter, but that the east will fit more loosely after the swelling goes down. In order to deal with this problem, a scored cast, which allows some expansion for swelling, is used; once the swelling goes down, this type of cast can be tightened with adhesive tape. The experts also agreed that one cannot determine if a cast is too tight or too loose on the basis of x-rays alone; this [(¡decision should be based on an examination of the cast and the patient’s complaints.
Dr. Reyes, who examined Amanda in 1990 after the surgery by Dr. Haddad, was presented with a summary of the lay testimony describing the condition of Amanda’s cast. He was then asked if, based on those facts, the cast was too loose and needed replacement. He responded that if presented with that situation he would take an x-ray to see if there had been any movement in the bones. He acknowledged that a cast that was either too loose or too tight would be a problem. Dr. Reyes testified that a cast that was properly fitted initially could become loose when the swelling went down, allowing angulation. For these reasons, this type of fracture had to be followed very closely.
Dr. Haddad testified that the deformity in Amanda’s arm was caused because the re *1216 duction [4] of the fracture was lost. He posited three causes: (1) the cast got too loose; (2) the cast was broken; or (3) the swelling in the arm went down. Dr. Haddad also testified that this type of fracture in a child of Amanda’s age is tricky and needed to be followed closely so as not to lose the reduction. In his opinion, the standard of proper care required a re-examination within a few days to check the cast and the reduction, plus weekly follow-ups for the first three or four weeks after the injury.
Dr. Licciardi testified that he did not realize that the reduction of Amanda’s fracture was lost until he took the cast off on August 21, 1985. He admitted that the July 31st x-ray showed a five degree angulation, which he felt was acceptable, although the x-ray of July 19th showed that “the bones hadn’t moved in ten days.” [7He did not recall at trial if he had-ever taped Amanda’s cast, although he had asserted that he had done so in his submission to the medical review panel. He acknowledged that the taping would be apparent if it had been done. Dr. Licciar-di admitted that his office notes made no mention of any complaints of looseness by Amanda or her mother, which indicated he did not consider those complaints significant. Dr. Licciardi testified that he saw no sores when he removed the cast, but he did note areas of reddening.
Dr. Stokes, who testified on the defendant’s behalf, opined that a east should be changed if it was so loose that the fracture could angulate or if x-rays showed some an-gulation. Dr. Stokes agreed that the x-ray of July 31st showed a five to ten degree angulation. He stated that it was his impression that Dr. Licciardi taped the split cast on the first office visit after the swelling went down, which was consistent with the standard of care.
Dr. Phillips also reviewed the July 31st x-ray and confirmed the angulation that was not present on the earlier x-ray. On cross-examination he testified that if angulation was seen on x-ray, the cast should be examined to determine if “snugging it up” would help prevent the angulation from progressing.
The plaintiffs presented lay testimony as to the fit of the cast. Amanda Torbert testified that her arm was swollen at first and the cast was fine. However, when the swelling went down, the cast became so loose that she could put three fingers in the top and scratch, and she could scratch her knucldes from the bottom. She also testified that the cast was so loose she could move it, and it felt like it was rubbing her elbow raw, as though she had a sore. It also was rubbing her arm about midway between her elbow and wrist. She denied that the cast had been taped after the swelling went down.
| sLaura Torbert testified that a groove was initially cut in the cast at the hospital, and that the cast was noticeably loose on the first office visit, She also denied that the east was tightened by taping it. She confirmed that Amanda could put her hand in the top of the cast and move it.
Marsha Redler and David Dixon, two family friends, also testified that the cast appeared to be very loose; neither noticed tape on the cast.
In sum, there was expert testimony establishing that this type of fracture was very difficult to manage -and must be followed very closely. According to Dr. Haddad, the standard of care under these circumstances required weekly reexaminations to check and possibly change the cast. The evidence presented by the plaintiffs established that the east was so loose that it was rubbing Amanda’s elbow, and that this was reported to the doctor, who apparently chose to ignore it. The experts agreed that the x-ray taken on July 31st showed that this fracture had begun to angulate. Despite this, Dr. Licciardi did not change the east nor did he see Amanda weekly. Thus, in light of the evidence of angulation on July 31st and the patient’s complaints about the cast’s condition, the jury reasonably could have concluded that Dr. Liceiardi’s failure to check Amanda’s cast weekly was below the standard of proper *1217 care and the cause of Amanda’s subsequent deformity.
In a medical malpractice action the plaintiff must prove the standard of care applicable to the charged physician, a violation by that physician of that standard, and a causal connection between the physician’s negligence and the plaintiff’s resultant injury. La.Rev.Stat.Ann. § 9:2794 A; Pfiffner, 94-0924, p. 8, 643 So.2d'at 1233; Soteropulos v. Schmidt, 556 So.2d 276, 278 (La.App. 4th Cir.1990). It is well settled that a court of appeal may not set aside a trial court’s | afinding of fact in the absence of manifest error, and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Stobart v. State, through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). As stated above, the evidence presented here supports the jury’s finding of liability under these standards.
DAMAGES:
Amanda Torbert appeals the jury’s damage award of $65,000.00[5], arguing that since the undisputed medical expenses were just over $15,000.00, $50,000.00 for her general damages is inadequate. Relying upon other appellate decisions involving similar injuries, she contends that the evidence of her pain and suffering, permanent disability, scarring and disfigurement, especially considering her age at the time, necessitate an increase of total damages to between $115,-000.00 and $135,000.00.
The Supreme Court has delineated our function when a general damage award is challenged on appeal:
[T]he role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
[[Image here]]
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the “much discretion” of the trier of fact_ Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion.
Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, — U.S. —, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994) (citations omitted). In determining whether an abuse of discretion has been shown, the relevant evidence must be viewed in the light which offers the most support to the trial court’s judgment. Id. at 1261.
The testimony and photographic evidence establish that Amanda had an obviously deformed forearm after Dr. Liceiardi removed her cast August 21, 1985, and because of this she was subjected to cruel remarks from her peers. However, corrective surgery was performed less than two-and-a-half months later with good results. Although she had to undergo surgery again in January 1988 and has permanent scarring from these procedures, nothing was presented to suggest she has had any significant impairment of her lifestyle or abilities.[6] On the evidence presented, we cannot say that this award is below that which a reasonable factfinder could assess for Amanda’s injuries.
For these reasons, the judgment is affirmed.
AFFIRMED
*1218 ARMSTRONG, J., dissents.
WALTZER, J., concurs in part, dissents in part.

. She was twenty-two years old at the time of trial.

. The plaintiffs argue that the trial court erred by failing to qualify Dr. Reyes as an expert in orthopedic surgery instead of an expert only in general surgery. Since the trial court did not prevent Dr. Reyes from answering any questions, the error, if any, would be harmless. Also, Dr. Reyes was primarily a liability witness and, of course, the plaintiffs prevailed as to liability.

. Dr. Kerr, the third member of the medical review panel, passed away prior to trial without having been deposed.

. This term refers to the process of bringing the fragments of a broken bone into alignment for healing.

. The jury was not asked to itemize their damage award, only to provide an amount which “would fairly and adequately compensate Amanda ... for her injuries and expenses.’’

. By the time of trial, Amanda was a married homemaker with one child.