809 So.2d 1145 (2002)
Geraldine JACKSON
v.
UNIVERSITY HOSPITAL, Medical Center, Dr. Tanya White-Mims, Dr. William Robinson, III, Dr. John Doe, and ABC Insurance Company.
Walter Jackson, Dwayne Jackson, Christine Jackson, Jason Jackson, and Eva B. Ruffin, Individually and for and on Behalf of Christine Jackson and Jason Jackson,
v.
State of Louisiana, Louisiana Health Care Authority; Medical Center of Louisiana at New Orleans-Charity Campus; Medical Center of Louisiana at New Orleans University Campus; Dr. William Robinson, III; Dr. Simie Degefu and Dr. Tanya White-Mims.
Nos. 2000-CA-2535, 2000-CA-2536.
Court of Appeal of Louisiana, Fourth Circuit.
February 6, 2002.
*1146 Owen J. Bradley, New Orleans, LA, and Paul P. Tusa, Kenner, LA, Counsel for Plaintiffs/Appellants.
Richard P. Ieyoub, Attorney General, Caroline Norton, Assistant Attorney General, Louisiana Department of Justice, Litigation Division, New Orleans, LA, Counsel for Defendants/Appellees.
Court composed of Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY and Judge MAX N. TOBIAS, JR.
PATRICIA RIVET MURRAY, Judge.
This is a medical malpractice action. Plaintiffs, Walter Jackson, Dwyane Jackson, Christine Jackson, Jason Jackson, and Eva B. Ruffin, individually and for and on behalf of Christine Jackson and Jason Jackson, are the heirs of Geraldine Jackson. Plaintiffs appeal the trial court's finding that the defendants' negligence did not result in Ms. Jackson's loss of a chance to survive cervical cancer. Defendants, the State of Louisiana, Louisiana Health Care Authority, Medical Center of Louisiana at New Orleans (the "State") and Dr. *1147 William Robinson, III, answered the appeal, claiming that the trial court erred in finding Dr. Robinson breached the standard of care by severing both Ms. Jackson's ureters and by awarding $150,000 in general damages for such negligence plus incidental medical expenses through October 25, 1994. For the reasons that follow, we affirm.

FACTS
On August 15, 1994, Ms. Jackson first presented at Charity Hospital's Radiology-Oncology Clinic. Ms. Jackson was referred by her private physician after her cervical biopsy revealed signs of cancer. At the clinic, she initially was seen by Dr. Simie Degefu, a board certified obstetrician-gynecologist ("OB-GYN"). Based on his examination, Dr. Degefu confirmed the presence of cervical cancer; he estimated the size of the tumor on Ms. Jackson's cervix to be three to four centimeters. Dr. Degefu explained to Ms. Jackson that further testing was needed to determine the stage of her cancer and the appropriate primary treatment optionradical hysterectomy or radiation treatment. Dr. Degefu thus scheduled an abdominal CT scan, requested the cervical biopsy slides from the pathologist, and arranged for Ms. Jackson to be further evaluated by Dr. William Robinson, III, a board-certified OB-GYN oncologist.
On August 16, 1994, Ms. Jackson underwent a CT scan of the pelvis and abdomen. On August 17, 1994, she was seen by Dr. Robinson and Dr. Tanya White-Mims, a fourth-year OB-GYN resident who was rotating for one month in the OB-GYN oncology department. Both Drs. Robinson and White-Mims concluded that Ms. Jackson had Stage-1B cervical cancer and estimated the size of Ms. Jackson's tumor to be five centimeters.[1] The decision was made that Ms. Jackson would have a radical hysterectomy,[2] and, on that same date, Dr. White-Mims met with Ms. Jackson to discuss the procedure and to have her sign the surgical consent form.
On August 24, 1994, Ms. Jackson underwent a radical hysterectomy at Charity Hospital. The surgery was performed by Dr. Robinson with Dr. White-Mims assisting. According to Dr. Robinson, he cut and dissected the tissue around one of the uretersi.e., the hollow tubes that connect, and take urine from, the kidneys to the bladderand directed Dr. White-Mims in cutting and dissecting the tissue around the other ureter. Both Dr. Robinson and Dr. White-Mims testified they observed the ureters both during surgery and before closing; at those times the ureters were peristalsingi.e., squeezing urine and moving it along the course. The operative report states that there were no complications and that the ureters were dissected with "meticulous care."
The post-operative pathology report dated August 29, 1994, confirmed that Ms. Jackson had stage-1B cervical cancer, but the actual size of her tumor was six centimeters, as opposed to the estimated five centimeters. Although the surgical tumor margins were clear, the tumor was close to the margins. Particularly, the pathology report states that "the tumor comes within 2 mm of the surgical margin." Due to that closeness, Dr. Robinson recommended that Ms. Jackson undergo radiation therapy to reduce the risk of the cancer reoccurring. Ideally, such radiation therapy would begin six weeks post-operation.
*1148 During the week following surgery, Dr. Robinson did not see Ms. Jackson; rather, he testified that in teaching hospitals like Charity it was standard practice for the residents to see the patients daily, to discuss their findings with the faculty, and to contact the faculty if needed. That first week was relatively uneventful. However, on August 30, 1994, Dr. White-Mims contacted Dr. Robinson to inform him that Ms. Jackson was leaking urine from her vagina.[3] On the day before, a resident noted that Ms. Jackson's fluid intake and output should be monitored because it was not balanced and that she was leaking urine from around her catheter.
To determining the source of the urine leak, Dr. Robinson performed a methylene blue test, which ruled out the bladder as the source. An intravenous pyelogram ("IVP") also was performed, but was inconclusive. On August 31, 1994, Dr. Robinson performed a nephrostomy, which indicated probable blockage of the right ureter. That same day, Dr. Robinson unsuccessfully attempted to insert a right nephrostom tube. Also on that same date, Drs. Robinson and White-Mims rotated off the service. The next day, September 1, 1994, Dr. Degefu took over the service and Ms. Jackson's care. On September 2, 1994, Dr. Barry Blank, an interventional radiologist, successfully placed a right nephrostom tube, and Ms. Jackson stopped leaking urine.
On September 5, 1994, Ms. Jackson started leaking urine again, and the urology department was first consulted. Dr. Ghoneim, a urologist, performed a cystoscopy and recommended a left nephrostom tube. On September 7, 1994, a CT-Excretory Urogram was performed; Dr. Erich Lang, a radiologist, reported that the CT showed both Ms. Jackson's left and right ureters were partially severed. On September 9, 1994, Dr. Blank placed both a left nephrostom tube and bilateral ureteral stents, and Ms. Jackson had no further leakage. The next day Ms. Jackson was discharged.
Between her discharge from the hospital on September 10, 1994, and October 25, 1994, Ms. Jackson made several visits to various Charity out-patient clinics. Summarizing those visits, the trial judge in her oral reasons for judgment stated:
On September 19, 1994, Ms. Jackson was seen in the OB-GYN Oncology Clinic at Charity. The records indicate that a small area of the surgical wound was still open but there was no signs of an infection.
On September 20, 1994, Ms. Jackson had a nephrostogram in the Urology Clinic. She was then given a follow-up appointment for October 18th for discontinuance of the nephrostom tube.
On October 3, 1994 and October 10, 1994, Ms. Jackson was seen in the GYN Oncology Clinic at Charity. Dr. J.P. Austin, a Radiation-Oncologist was consulted and he concluded that the radiation therapy should be started after the nephrostom tubes were removed. Ms. Jackson's medical records reflect that she understood the course of the radiation treatment.
On October 12, 1994, Mrs. Jackson underwent a bilateral [n]ephrostogram in the [U]rology Clinic at Charity and her nephrostom tubes were removed. She was scheduled to be seen in the Radiology-Oncology Clinic the following week. On October 17, 1994 Ms. Jackson was examined in the Radiation-Oncology *1149 Clinic and the records reflect that she was no[t] leaking urine and had no complaints.
On October 24, 1994, Ms. Jackson was again seen in the Radiology-Oncology Clinic. The records reflect that radiation was to begin when the stents were removed.
On October 25, 1994, Ms. Jackson was seen in the Urology Clinic.
Although she had an appointment on October 26, 1994 to check the position of the stents, Ms. Jackson did not keep it. Indeed, Ms. Jackson did not return to the Clinic until March 15, 1995; hence, there was a four month gap in treatment. At least two attempts were made to contact Ms. Jackson regarding the need for her to return to the Clinic for treatment. First, in January 1995, Dr. Ahuja, a Urology Clinic physician, wrote Ms. Jackson requesting she return for needed therapy. And, in February 1995, Dr. Degefu spoke with Ms. Jackson's mother on the phone regarding her daughter's failure to return to clinic for needed treatment; at trial, however, Ms. Jackson's mother denied receiving this call.
As noted, on March 15, 1995, Ms. Jackson returned to the Radiation-Oncology clinic, complaining of a two-week history of urine leaking from the vagina and a fainting episode on the prior day. Upon examination, she was determined to have a large anterior vaginal mass, and she was admitted into the hospital for testing. The tests revealed that the cancer had spread to other parts of her body. After being discharged, Ms. Jackson underwent radiation therapy from March to July 1995. Over the next eleven months, however, the cancer continued to spread, her condition continued to worsen, and she was hospitalized several times for various ailments. Ultimately, Ms. Jackson died in June 1996.

PROCEDURAL HISTORY
Ms. Jackson's four children filed this medical malpractice complaint pursuant to the Medical Liability for State Services Act, La. R.S. 40:1299.39, et seq., against Drs. Robinson, Degefu, and White-Mims, and their employer, the State. Their complaint alleged medical malpractice, lack of informed consent, wrongful death, and loss of a chance of survival. Their complaint was presented to a medical review panel consisting of two OB-GYNs, Drs. George B. Morris and William Sargent, and one OB-GYN oncologist, Dr. Michael A. Finan.
On August 27, 1998, the Medical Review Panel rendered its decision. The panel found the evidence did not support the conclusion that the State or Drs. Degefu and White-Mims failed to meet the applicable standard of care as charged in the complaint. As to the State and Drs. White-Mims, Degefu, and Robinson, collectively, the panel made the following four findings:
1. The decision to do surgery instead of radiation was reasonable.
2. Allowing a resident to assist in surgery is acceptable.
3. Intra operatively, there is no evidence that the standard of care was breached.
4. There is a question of fact as to whether or not the patient was adequately informed.
As to Dr. Robinson, individually, however, the panel found the evidence did support the conclusion that he failed to meet the applicable standard of care as charged in the complaint; specifically, the panel found:
1 Post operatively, the failure of Dr. Robinson to evaluate his patient on a daily basis is a deviation from the standard of care.

*1150 2. A more timely consult to urology should have been made once the attempt to place stents in the ureter had failed.
3. The panel is unable to state an opinion as to whether the foregoing action or inaction by Dr. Robinson caused damage to the patient.
This timely malpractice suit followed. Pre-trial, Dr. White-Mims was dismissed. After a four-day bench trial, the trial judge found Dr. Degefu was not negligent, but Dr. Robinson and the State were negligent. In her reasons for judgment, the trial judge noted:
While Ms. Jackson did not lose a chance of survival due to the negligence of Drs. Robinson and White-Mims and their employer she did sustain damages. Specifically, the court find[s] that these defendants breached the standard of care by cutting both of Ms. Jackson's ureters during the radical hysterectomy and then by their failure to timely diagnose[] the injury.
Their negligence resulted in Ms. Jackson having to undergo several surgical procedures including two cystoscopies, placing nephrostom tubes in both ureters and the placing of bilateral stents.
The trial judge thus awarded Ms. Jackson's heirs $150,000 for her physical pain and suffering and all medical expenses associated with her ureter injuries up to October 25, 1994, which was the date of her last clinic visit before the four month gap in treatment.

DISCUSSION

(a) Defendants' Appeal
Defendants briefed two assignments of error; namely, defendants contend that the trial court was manifestly erroneous in: (1) finding that Drs. Robinson and White-Mims partially severed both of Ms. Jackson's ureters and that this was a breach of the standard of care given the lack of expert testimony supporting this finding; and (2) finding that Drs. Robinson and White-Mims breached the standard of care by not performing intraoperative tests to determine the integrity of Ms. Jackson's ureters.
Both defendants' arguments go to the issue of whether plaintiff's met their burden of proof. In a medical malpractice case, the plaintiff's burden is statutorily set forth in La. R.S. 9:2794(A), which provides:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La. R.S. 9:2794(A).
At trial, plaintiff's argued that Dr. Robinson breached the standard of care by cutting both of Ms. Jackson's ureters during surgery. In support, plaintiff's offered the testimony of their expert, Dr. Raviotta, who is a board certified OB-GYN, and Dr. *1151 Lang, the radiologist who performed the CT scan following surgery and who testified at trial that Ms. Jackson's ureters were cut. Plaintiffs also cite Bryant v. St. Paul Fire & Marine Ins. Co., 272 So.2d 448 (La.App. 2nd Cir.1973), for the proposition that "the severing of plaintiff's ureter during a modified radical hysterectomy was such an unusual event [that ordinarily does not occur without some negligence on the doctor's part] placing the burden upon defendant doctors to prove they were not negligent." Id. at 451.
Defendants countered that the injuries to Ms. Jackson's ureters were not direct not a cut or sever in surgerybut indirect by devascularization which results from a cut off of the blood supply that leads to necrosis.
Agreeing with plaintiff's and finding that Dr. Robinson breached the standard of care by partially severing both of Ms. Jackson's ureters, the trial court relied on the expert testimony of not only Drs. Lang and Raviotta, but also on Dr. Robinson's own testimony. The court noted that both Drs. Robinson and Raviotta testified that it was a breach of the standard of care for a surgeon to sever one ureter, much less both ureters.
In finding the record supported a finding that Dr. Robinson severed both ureters, the trial court relied upon the testimony of plaintiff's expert, Dr. Raviotta. Based on his review of the operative report of Ms. Jackson's radical hysterectomy, Dr. Raviotta noted several problems and inconsistencies. Outlining those problems, the trial judge noted in her reasons for judgment:
Specifically, he testified that the operative report reflect[s] that the defendant surgeons changed retractors during the procedure which he characterized as unusual, that bovine was used around the ureter and that in the same area of the injury the vessels were clamped but there was no indication in the record that the clamps were removed and in fact on x-ray clips were seen in the ureteral area. That the bladder was taken down twice, which he testified would increase the risk of damaging the bladder and ureters and that the records did not even mention the cardinal ligament.
Taken together, Dr. Raviotta opined that these problems lead him to conclude that Dr. Robinson injured Ms. Jackson's ureters during the surgery.
Defendants argue that the trial court's reliance on Dr. Raviotta's testimony was misplaced as Dr. Raviotta never testified that the ureters actually were severed and as he was not a cancer specialistan OB-GYN oncologist. Although Dr. Raviotta was only an OB-GYN, the record reflects that the trial court expressly found he had sufficient experience and training to opine on the performance of a radical hysterectomy, which was a much more complicated procedure than the regular hysterectomy, which an OB-GYN is trained to perform. In so finding, the trial court emphasized that Dr. Raviotta had assisted with performing radical hysterectomies, that he did a two-year fellowship in gynecological cancer, and that he was a professor. The trial court's reliance on Dr. Raviotta's testimony thus was not misplaced.
In finding a direct surgical injury occurred, the trial court also relied on the testimony of Dr. Lang, who was board certified in radiology, nuclear medicine, and advanced interventional radiology. Dr. Lang testified that the CT scan done on September 7, 1994, showed that the ureters were severed (cut) and that it was unlikely the injury was due to devascularization (or necrosis) for two reasons: (i) the time elementa vascular necrosis that occurs as a consequence of the procedure (the surgical stripping of the ureter) and *1152 results from removing vascular supply to the ureter takes three weeks or longer to occur; and (ii) the changes that occur with a necrosis result in a narrowing of the ureter over the compromised segment, whereas, in this case there was a single area where the extravasationescaping of body fluidsoccurred. Hence, Dr. Lang testified that the CT scan (which is 98-99% accurate in this respect) was not consistent with devascularization, but rather showed a partial severance of both ureters.
While defendants challenge Dr. Lang's testimony regarding the ability of a radiologist to determine from a CT scan the cause of injury to the ureter, the trial judge rejected that argument and found Dr. Lang's expert testimony convincing. The court noted that "Dr. Lang testified that the CT scan demonstrated that Ms. Jackson's ureters were severed" and, as noted, gave two reasons why it was "not likely that the injury was due to necrosis or devascularization." Emphasizing the timing element, the trial court noted that "the holes in Ms. Jackson's ureters were seen on a CAT scan approximately two weeks after her surgery;" whereas, devascularization, according to Dr. Lang, takes three or more weeks to occur.
The standard of review on appeal after a trial on the merits is to determine whether the trial court's findings are reasonable in light of the record reviewed in its entirety. Levron v. State Through Dept. of Health & Hosp., 94-2094, p. 7 (La.App. 4 Cir. 4/24/96), 673 So.2d 279, 285 (citing Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990)). It is well settled that a court of appeal may not set aside a trial court's findings of fact absent manifest error. It is also well settled that when there is conflicting testimony, reasonable credibility evaluations and reasonable factual inferences should not be disturbed on appeal despite that the court of appeal may believe its own evaluations and inferences are equally reasonable. Torbert v. Licciardi, 94-2026 at pp. 8-9 (La.App. 4 Cir. 4/24/96), 673 So.2d 1213, 1217 (collecting seminal cases on appellate standard of review).
Applying that deferential standard, while Dr. Finan voiced a contrary opinion that devascularization caused the injuries to Ms. Jackson's ureters, the trial court was presented with ample expert evidence from which it could conclude that Dr. Robinson breached the standard of care by partially severing both of Ms. Jackson's ureters during surgery. We cannot say that the trial court was manifestly erroneous in so finding.
Defendants' second assignment of error is that the trial court erred in finding Dr. Robinson breached the standard of care by not performing intraoperative tests to determine the integrity of Ms. Jackson's ureters. In support, defendants cite the Medical Review Panel's finding, based on the panel's review of the operative records, that there was no evidence of a breach of the standard of care in failing to perform such tests.
Reaching a contrary conclusion, the trial court found convincing Dr. Raviotta's testimony; the court noted:
Dr. Raviotta testified that it was insufficient for Drs. Robinson and White-Mims to simply look at the ureters. He noted that pursuant to the operative report, the tumor was only 1.15 inches from Ms. Jackson's ureters and that during surgery, Ms. Jackson lost 1500 cc's of blood which is more than normal and that a cut ureter artery was sent to pathology.
The trial court thus agreed that it was a breach of the standard of care for Dr. Robinson to fail to perform a simple test intraoperatively to determine the integrity of the ureters and that this breach caused *1153 Ms. Jackson damages in that "the sooner her injury was detected the sooner it could be repaired and the sooner the healing would begin."
Defendants stress that the operating surgeons, Drs. Robinson and White-Mims, testified that they observed the ureters both during surgery and in closing and saw no signs of damage. Defendants argue that the trial court erred in failing to give this testimony of the operating surgeons greater weight than that of plaintiff's expert, Dr. Raviotta. Defendants further argue that it was not a breach of the standard of care to not perform such tests when there was no reason to suspect an injury to the ureters during the surgery.
Once again, applying the deferential standard of review, we cannot say that the trial court was manifestly erroneous in concluding that Dr. Robinson's failure to perform such tests was a breach of the standard of care.
Defendants also assigned as error the trial court's finding that Dr. Robinson breached the standard of care by failing to see Ms. Jackson daily following the surgery. Given defendants' failure to brief this issue, we do not address it. Uniform Rules of Louisiana Courts of Appeal, Rule 2-12.4. We note, however, that this finding buttresses our holding that the trial court was not manifestly erroneous in finding fault on Dr. Robinson's part for delay in detecting the injuries to Ms. Jackson's ureters.

(b) Plaintiffs' appeal
The first assignment of error raised by plaintiff's is that the trial court erred in finding Ms. Jackson's ureter injuries did not cause her a loss of a chance of survival. More particularly, plaintiff's argue that the trial court erred in failing to recognize that Ms. Jackson's ureters never healed sufficiently for her to timely commence radiation treatment and therefore Dr. Robinson's negligence caused her a loss of chance of survival.
Rejecting plaintiff's loss of a chance claim, the trial judge noted in her reasons for judgment that plaintiff's have not shown by a preponderance of the evidence that any injuries Ms. Jackson sustained during surgery delayed her radiation treatment to the point of causing her a loss of a chance of survival. The trial court emphasized that while Dr. Raviotta testified that it did, the only two experts who testified that were certified in gynecological oncology, Drs. Finan and Robinson, both disagreed. They both agreed that radiation therapy is not begun until four to eight weeks following the surgery. They also both agreed that Ms. Jackson's ureter injuries may have delayed the start of radiation therapy by three to four weeks. Moreover, they both testified that it was Ms. Jackson's failure to return for treatment for over four months that caused her to lose a chance of survival. The best Dr. Finan could say was that it was "debatable" whether the three to four week delay due to the ureter injury caused Ms. Jackson any loss in chance of survival. For these reasons, the trial court concluded that plaintiff's failed to prove by a preponderance of the evidence that Dr. Robinson's negligence caused Ms. Jackson to lose a chance of survival.
In addressing the nature of a loss of chance of survival claim in the medical malpractice context, the Louisiana Supreme Court in Smith v. State, Dept. of Health & Hosp., 95-0038 (La.6/25/96), 676 So.2d 543, explained that the focus is on "the damages that the defendant caused the loss of a chance of avoiding a death that might not have occurred if the health care provided had performed properly," that the issue is "whether the tort victim lost any chance of survival because of the *1154 defendant's negligence," and that "[t]he pre-existing condition causes the conceptual problem." 95-0038 at p. 6, 676 So.2d at 546-47, n. 5.
In this case, plaintiff's contend that Dr. Robinson's negligence caused Ms. Jackson to lose a chance of survival in that it delayed the commencement of radiation therapy. We disagree. The record supports trial court's conclusion that the sole cause of Ms. Jackson's loss of a chance was her failure to return for treatment for over four months. Nor are we persuaded by plaintiff's related argument that the trial court factually erred in finding Ms. Jackson failed to return for treatment for over four months. In support of that contention, plaintiff's cite Ms. Jackson's deposition testimony that she did continue to see the urologists during those four months. The record, however, clearly supports the trial court's contrary factual finding. Indeed, at trial plaintiff's were given the opportunity to present evidence to support this allegation. Particularly, the court issued a written order to Charity's director of medical records requiring production in court of Ms. Jackson's entire original medical record. A review of that entire record revealed no visit or treatment by Ms. Jackson between October 26, 1994, and March 15, 1995. The trial court's finding that Ms. Jackson did not seek treatment during that four-month interval is thus amply supported by the record.
The second assignment of error plaintiff's raise is that the trial court erred in refusing to accept the testimony of their expert, Dr. Raviotta, on the issue of Ms. Jackson's loss of a chance of survival. Contrary to plaintiff's contention, the trial court did consider Dr. Raviotta's testimony; particularly, the court noted that "Dr. Raviotta testified that due to the injury to Ms. Jackson's ureters and the failure to repair them intraoperatively, there was a delay in the start of radiation treatment and this delay caused Ms. Jackson to lose a chance of survival." We cannot say that the trial court erred in finding the testimony of the two experts certified in gynecological-oncology, Drs. Finan and Robinson, more persuasive on this issue.
The final assignment of error plaintiff's raise is that the trial court erred in holding that a reasonable person in Ms. Jackson's position would have opted for surgery rather than radiation. In this regard, plaintiff's argued at trial that Ms. Jackson did not give her informed consent to a radical hysterectomy because six factors were not disclosed to her; to wit:
1. that radiation was an alternative treatment option;
2. that radiation had a comparable cure rate and that cervical cancer was highly sensitive to radiation treatment;
3. that she had no contraindications to radiation;
4. that she had significant surgical risk factors including the size of her tumor (pre-operative estimate of five centimeters; post-operative measurement of six centimeters), her severe obesity (she weighed approximately 290 pounds), her enlarged uterus (measured at 14 weeks in pregnancy terms), and her uterine fibrosis, or that these factors meant she had an increased risk of sustaining an intraoperative injury;
5. that due to the size of her tumor, there was a high foreseeability of inadequate surgical margins necessitating postoperative radiation; and
6. that if she were injured during surgery, her injuries would have to heal before she could start radiation.
Factually, Ms. Jackson testified in her deposition that none of the defendants discussed the treatment options or risks with *1155 her; rather, she testified that Dr. Degefu simply told her that "considering her age and everything" surgery was the best option. Conversely, Dr. Robinson, despite the lack of any documentation in the chart, testified that he discussed with Ms. Jackson both primary treatment optionsradical hysterectomy versus radiation treatment as well as the risks associated with each option and that she chose to have surgery.
While Dr. White-Mims testified that she did not hear Dr. Robinson discuss the options with Ms. Jackson, she further testified that she was not in the room with them during the entire discussion as she was seeing other patients. Dr. White-Mims further testified that she did not go into the treatment options with Ms. Jackson for two reasons: (i) it was not the staff physician's duty to do so, and (ii) the selection had already been made for her to have the surgery.
Based on these facts, the trial court found that Dr. Robinson did not inform Ms. Jackson that radiation was a treatment option. The trial court, however, found the expert testimony established contraindications to radiation for someone in Ms. Jackson's position. The trial court thus concluded that "a reasonable 36 year old female, such as Ms. Jackson would find that permanent long-term effects of radiation such as the loss of ovarian and vaginal function to be a contraindication to radiation."
The trial court likewise stressed that Ms. Jackson signed the consent form although she stated in her deposition that she did not read it but only "looked it over"that disclosed the risks. Dr. White-Mims testified that while she did not specifically recall meeting with Ms. Jackson on September 17, 1994, to sign the consent form, it was her practice to go over the surgical consent form with patients, and the trial court found Dr. White-Mims' testimony credible. That consent form enumerates the risk as "[p]ain, bleeding, scars, infection, injury to any organ or tissue including bladder, ureter, bowels, uterus, fallopian tubes, ovaries or blood vessels, incontinence of urine, pelvic floor relaxation or vaginal cuff abscess." That consent form also states that the physician has explained the risks of alternative treatment methods and the probability of success.
The trial court noted that all the experts agreed that the success (cure) rate for Stage 1-B cervical cancer was the same for either radiation or surgery, and Dr. Robinson quantified that rate as between 80 to 85%. The sole expert who testified that Ms. Jackson was a poor surgical candidate was Dr. Raviotta, plaintiff's expert OB-GYN. However, the trial court noted that Dr. Raviotta presented no admissible documentation to support his testimony.
On the other hand, the trial court noted that Drs. Sargent and Morris, who both were OB-GYNs and members of the Medical Review Panel, testified that while it was technically more difficult and demanding to operate on an obese patient, Ms. Jackson had no contraindications for surgery. Dr. Finan, the other panel member who was an OB-GYN oncologist, was noted by the trial court to have published a research article entitled Body Mass Predicts the Survival of Patients with New International Federation of Gynecology and Obstetrics Stage-1B1 and 1B2 Cervical Carcinoma Treated with Radical Hysterectomy. Dr. Finan's conclusion expressed in the article is that body mass is not a predictor of surgical complications and that obese patients have better survival rates following radical hysterectomies than do low body mass patients.
Before this court, plaintiffs again argue that surgery was contraindicated for someone in Ms. Jackson's position. Plaintiffs *1156 further argue that a reasonable, informed patient in Ms. Jackson's position would have opted for radiation. In support of the latter contention, plaintiffs quote Dr. Raviotta's testimony that it would be illogical for someone who knew there was "a high likelihood she's going to need postoperative radiation treatment" to select surgery as opposed to radiation "if the two methods are comparable." Simply stated, plaintiffs argue that it is illogical to suggest that a patient would consent to surgery after being informed that there was a high likelihood that post-operative radiation therapy would also be required.
The trial judge rejected a similar argument plaintiffs asserted regarding the alleged failure to inform Ms. Jackson that inadequate surgical margins were foreseeable, requiring post-operative radiation therapy. In so doing, the trial judge reasoned that "other than Dr. Raviotta, none of the experts testified that there was a high foreseeability of inadequate surgical margins and Dr. Raviotta had no admissible documentation to support his assertion."
To prevail on a claim that a health care provider inadequately disclosed the risks, a plaintiff has the burden of showing:
(1) The existence of a material risk unknown to the patient;
(2) A failure to disclose the risk on the part of the physician;
(3) That disclosure of the risk would have led a reasonable patient in plaintiff's position to reject the medical procedure or choose a different course of treatment; and
(4) Injury.
In re Medical Review Panel of Morris, 96-1771, p. 4 (La.App. 4 Cir. 11/12/97), 703 So.2d 723, 726. Some expert testimony must be presented defining the existence and nature of the "material risk" the patient allegedly was not informed about and the likelihood of its occurrence. Id. (citing Hondroulis v. Schuhmacher, 553 So.2d 398, 412 (La.1988)(on reh'g)). Simply stated, the plaintiff-patient must establish that disclosure of the material, unknown risk would have led a reasonable person in the patient's position to opt for a different treatment.
Applying that standard, we find that the trial court's conclusion that plaintiffs failed to establish that a reasonable person in Ms. Jackson's position would not have opted for surgery as opposed to radiation was reasonable. Given Ms. Jackson's young agethirty-six years oldthe potential benefits of surgery as opposed to radiation were avoiding the long-term complications that likely can result from radiation such as loss of vaginal and ovarian function. Although Dr. Raviotta testified that surgery was contraindicated, all the other experts testified to the contrary. More importantly, the trial court noted that Ms. Jackson did not testify in her deposition that if she had been informed of the option of radiation therapy she would have chosen it. We thus reject plaintiffs' informed consent argument.

DECREE
For the reasons assigned, the judgment of the trial court is affirmed. Defendants are to bear all costs of this appeal.
AFFIRMED.
NOTES
[1] Stage 1 cervical cancer means the cancer is confined to the cervix.
[2] Plaintiffs contend that Ms. Jackson's consent was not informed in that she was not told about the option of radiation therapy. That issue is discussed elsewhere in this opinion.
[3] The record reflects that during that week Dr. White-Mims was documented in the chart as having seen Ms. Jackson only twice. However, Dr. White-Mims testified that she may have seen her more often but could not say for sure since the junior residents did the actual charting.