STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-504

STEPHEN MICHAEL "DUKE" ALLGOOD, ET UX.

VERSUS

ROCH BORDELON, ET AL.

**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2009-3899-A
HONORABLE MARK A. JEANSONNE, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of James T. Genovese, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

GENOVESE, J, concurs in the result.

REVERSED AND RENDERED.

Howard B. Gist, III
The Gist Firm
P. O. Box 13705
Alexandria, LA 71315
(318) 448-1632
COUNSEL FOR DEFENDANT/APPELLEE:
    Avoyelles Parish School Board

**Rodney M. Rabalais**
**Attorney at Law**
**P. O. Box 447**
**Marksville, LA 71351**
**(318) 253-4622**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Roch Bordelon**

**Victor H. Sooter**
**Sooter & Associates**
**P. O. Box 1671**
**Alexandria, LA 71309**
**(318) 448-8301**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Stephen Michael "Duke" Allgood**
    **Patricia Allgood**

**GREMILLION, Judge.**

Appellants, Stephan Michael "Duke" Allgood and his wife, Patricia Allgood, appeal an adverse jury verdict in favor of the Avoyelles Parish School Board and Roch M. Bordelon. For the reasons that follow, we reverse and render.

## FACTS AND PROCEDURAL HISTORY

On Sunday, January 25, 2009, Bordelon was employed by the Avoyelles Parish School Board as the girls' basketball coach for Marksville High School. A practice was scheduled for that day, but Bordelon arrived with an alcoholic beverage in his hand. He appeared highly agitated, and as practice proceeded, that appearance was confirmed.

The following morning, Allgood, the principal of the school, accompanied by Coach Chris Dupuy, went to Bordelon's home to check on his condition, as he had not arrived at school. Dupuy and Allgood found Bordelon at his home. He appeared agitated and told them he did not want them in his house. Bordelon indicated that he wanted to go to a pharmacy and to his church. Allgood accompanied Bordelon, and Dupuy followed them shortly thereafter.

At the church, Bordelon spoke with the pastor. This discussion was held in private, but Bordelon was heard yelling at first. Apparently the pastor was able to calm Bordelon down. After they emerged, Bordelon saw his father there and again became agitated, because he did not understand why someone would have involved his father in this situation. Bordelon then left, and Allgood and Dupuy returned to the school.

Sometime after this, Bordelon went to the school and met with Allgood in the his office. Bordelon was overheard screaming and cursing—which he

denied—at Allgood. He then exited Allgood's office, still in a state of high agitation. Allgood followed Bordelon down the hall and out of the building.

The events that followed were disputed in Bordelon's testimony and that of the other witnesses. Bordelon claimed that he berated Allgood for not standing up to the Avoyelles Parish School Superintendent, Dwayne Lemoine, who had decided that Bordelon should be placed on paid administrative suspension. He also claimed that he accused Allgood of gambling on the school-owned computer in his office. According to Bordelon, Allgood became agitated himself and began yelling at him in a manner that spittle struck Bordelon's face. Bordelon then spat back in Allgood's face. Allgood then struck Bordelon with an open hand, and Bordelon then grabbed Allgood, threw him to the ground, and kicked him. As will be discussed below, other witnesses, including Allgood, testified to a very divergent scenario.

Allgood sought medical treatment for temporomandibular joint dysfunction (TMJ) and other injuries. He filed suit against Bordelon and the Avoyelles Parish School Board. The matter was tried to a jury, which found that Bordelon had committed a battery upon Allgood, that Allgood was sixty percent comparatively at fault in the incident, and that he should be awarded no money. Allgood then perfected this devolutive appeal, asserting the following assignments of error:

> The jury verdict and resultant Judgment are contrary to the law and the evidence in the following particulars:
>
> A.    Re: Damages
>
>> 1.    The jury committed an error of law by not awarding the medical expenses that were stipulated to by the parties, with such Stipulation being entered into evidence without objection.

2. The jury committed an error of law by not awarding general damages where liability was found against the defendant and special damages were stipulated to by all counsel for all parties.

3. The jury committed an error of law by not awarding damages for future medicals expenses [sic] despite the unchallenged testimony or [sic] board certified oral surgeons and medical doctors.

4. The jury committed an error of law by not awarding any damages for loss of consortium, given that such damages are derivative of the personal injury claim.

B. Re: Liability

That the jury committed an error of law is finding that Roch Bordelon was not within the course and scope of his employment with the Avoyelles [P]arish [S]chool [B]oard at the time that the battery occurred.

C. Comparative Fault

That the jury committed error of law in finding that Plaintiff herein, Stephen Michael "Duke" Allgood, did not commit any *intentional* act that caused [or] contributed to the battery. Therefore, the jury's apportionment of 60% of the fault in causing the battery to plaintiff is contrary to the law and evidence.

D. Costs of Court

That court costs should be assessed against both defendants, to include court reporter invoices for videotape depositions offered at trial without objection, as well as expert witness fees for all physicians qualified and accepted as experts in this case.

E. That the trial judge committed error in not granting Plaintiff-Appellants Motion for Judgment NOV/ New Trial.

**ANALYSIS**

The tort of battery is defined as, "A harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact." *Caudle v. Betts,* 512 So.2d 389, 391 (La.1987). The issue is whether the defendant intended to inflict either a harmful or offensive contact without the other's consent, and not whether he intended to cause damage or injury. *Landry v. Bellanger*, 02-1443, p. 6 (La. 5/20/03), 851 So.2d 943. When a battery is the subject of a civil action, courts are mandated by La.Civ.Code art. 2323 to assess the fault of all parties whose intentional conduct contributed to the plaintiff's damages. *Id.*

*Allocation of fault*

No party disputes that Bordelon committed a battery upon Allgood; the issue is what, if anything, Allgood did to contribute to that battery. The jury found Allgood 60% at fault in the altercation. This finding is subject to review under the manifest error standard. *Layssard v. State, Dep't of Pub. Safety & Corr.*, 07-78 (La.App. 3 Cir. 8/8/07), 963 So.2d 1053, *writ denied*, 07-1821 (La. 11/9/07), 967 So.2d 511. Under the manifest error standard, we must decide whether the findings of fact are reasonable, even though we may feel our own evaluations and conclusions are more reasonable. *Stobart v. State, through Dep't of Transp. & Dev.,* 617 So.2d 880 (La.1993). Of this test, the supreme court has stated:

> In *Stobart v. State, through DOTD,* 617 So.2d 880 (La.1993), this court set forth a two-part test for the reversal of the fact-finder's determinations:
>
> 1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
>
> 2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

4

*Purvis v. Grant Parish Sch. Bd.*, 13-1424, p. 4 (La. 2/14/14), 144 So.3d 922, 926. When there is conflicting or contradictory evidence or where the finder of fact's decision was based on assessments of credibility, "that finding can virtually never be manifestly erroneous." *Id.*

The testimony regarding this altercation between Allgood and Bordelon varied in detail. Bordelon's description was:

> Q: Well after you left the [school's] door, he's following you and he's trying to talk to you and you're not listening, you're not turning around, you're not acknowledging him, right?
>
> A: (INAUDIBLE).
>
> Q: But at some point you do stop?
>
> A: I do, right after, he was asking me, he says "Roch, what the fuck are you doing, what the fuck is going on".
>
> Q: So you're saying that you specifically recall principal Allgood dropping the F bomb, but you don't recall dropping the F bombs down the hall or in his office or going outside, is that right?
>
> A: That is correct. Now in his office I didn't, in the hallway I just don't recall and I know for surely that I didn't in his office.
> . . . .
>
> Q: So at some point you turned around-and you maintained that principal Allgood said "Roch, what the F are you doing"?
>
> A: Correct and "what the fuck is going on", "what the F are you doing".
>
> Q: So you turned around and then what did you do then?
>
> A: Yep.
>
> Q: And then what did you do then?
>
> A: And then I turned around and I said "what are you doing" he was asking me what the F am I doing so I said "what are you doing" I said, "why are you doing this", I said, "I've never been in trouble before, never been in trouble, never had anything, what are you doing this, why are you taking my girls away", I said, "you see the gym right there that's therapy for me, why are you doing this" he says, "uh

uh, you want to know why, you want to know why, cause you brought an alcoholic beverage on school grounds yesterday" I said, "how do you know it wasn't a virgin daiquiri..."

Q: That wasn't the case though was it, Mr. Bordelon, you admitted to the jury earlier this morning...

A: No, no, it was an alcoholic beverage I was just making a point. I said "how you know it wasn't a virgin daiquiri" and before he could say anything else I said, "well I guess I'm just as guilty as somebody who gambles on school computers" and that's when he turned beet red and started, "uh uh uh" and he got in my face and yelled "you're fired".

Q:     Then what did you do?

A:     Well as he...when he gets mad he spits, but he didn't mean it directly, but indirectly when he got in my face, I could have kissed him, and salvia [sic] it hit me but it was indirectly, I spit on him.

Q: So you spit in the face of your supervisor who...

A: Correct.

Q: ...had been following you since he left his office and you would not turn around to acknowledge him, so you spit in his face?

A: Right after, yeah I could have kissed him he was so close.

Q: If somebody spits in your face, what are you going to do?

A: I don't know, but I'm for sure not going to get up in somebody's face and yell "your [sic] fired". I don't know what I would do if somebody would spit in my face.

. . . .

Q: So now you spit in principal Allgood's face, what happens after that?

A: He hit me.

Q: Then what happened?

A: And then we got together and tussled and we hit each other.

Q: Then what happened?

6

A: That was it, it only lasted a couple of seconds. We were fighting, he hit me above in the temple, cause I ducked and he hit me right here. I grabbed him with my left hand, he grabbed me with his left hand and there's two right that were going and I'll describe it to you like I did the other day, like it was a hockey fight when you're grabbing somebody and just the one hand is swinging and that's what happened. We were underneath the walkway and you have about a three to four inch lip that's still there right now today and while we were tussling, he fell. When he fell, right when he fell he started to lunge and I kicked him.

Other witnesses gave accounts that dramatically diverged from Bordelon's.

Coach Randy Price, who was the girls' softball coach at the time, was a short distance away at the softball field. His testimony was:

A: I was at the girls softball field, I was working on my field and I heard what sounded like people talking, I looked up and at that time I saw Roch coming out of the main building and Duke was behind him. I heard Roch say, "what the fuck do you want"...

Q: And this would be Mr. Bordelon saying that?

A: Yeah, Mr. Bordelon.

Q: All right.

A: Mr. Allgood then responded back with "Roch, I just want to help you", at that time...

Q: You heard that distinctly?

A: Yes, I did.

Q: Then after that what happened?

A: I looked back down at what I was doing and I heard noise, I looked up and I saw Mr. Bordelon throwing punches at Mr. Allgood. I then jumped over the wall that I was working at, it's a small wall, I was able to get over easy, started running through the parking lot, across the road. At that time I saw Mr. Allgood was down on all fours and I saw Mr. Bordelon what looked like was kicking at him, I never saw him kick him per say[sic], but it looked he was kicking at him. At that time I began hollering, I'm not for sure what I was saying, probably hey or something like that, and Mr. Bordelon then started walking toward me and as we approached, we really never made any kind of eye contact and I stopped and he made a statement that said "now look who needs help".

7

Math teacher Adra Hukins' classroom looked onto the courtyard where the altercation occurred. She testified:

A: Okay, it was fifth period if I remember correctly and all of sudden I heard a lot of loud hollering, it sounded primarily like the voice of one person. As a classroom teacher I immediately went to my classroom door to look out in the hallway to see what kind of commotion was going on, I did not see anybody at that point because they were in motion. I went back into my classroom and was continuing to hear everything and when I looked out the glass door, cause [sic] where my classroom was there was actually a glass exit door to go out into the courtyard, at that point I could see Mr. Allgood and Mr. Bordelon walking down the sidewalk.

Q: Did you ever determine who [it] was that was yelling?

A: Yes, it was pretty obvious who was yelling. From what I could see it looked like Mr. Allgood was trying to escort Mr. Bordelon off of campus for whatever, Mr. Bordelon would walk away from Mr. Allgood like towards where the back parking lot was, in front of the gym and everything. He would take a couple of steps, he would turn around and he would come back to Mr. Allgood kind of bowing up at him, yelling at him, I was continuing to hear him holler.

Q: Did he use profanities?

A: I really can't say that I remember.

Q: But you did see?

A: I did see him yelling and bowing up and getting in his face and then he would turn and he would walk away and he'd take a few more steps then he's come back, it just, he was very aggravated.

Q: Agitated?

A: Very.

Q: Did principal Allgood, was he yelling?

A: No he was not, he was slow, he had the same pass [sic], slowly walking closer and closer to that, half way down that sidewalk in front of the gym like he was trying to get him off-the campus.

Q: Okay and when you say that Mr. Bordelon would come back and bow up into principal Allgood's face, what do you mean by that?

A: I just mean that, you know getting in his face, he was yelling, you could see scolding at him, waiving [sic] his arms in the air, pointing and then turn and walk away and then come back a little bit later and do it all over again.

Q: Then did you see anything after that?

A: After that they had actually stopped about halfway down the sidewalk in front of the gym and there was some type of exchange there, I'm not exactly sure what had happened, I saw...cause [sic] they were directly in my line of sight, I could see Duke's back and I could see Roch standing right in from of him facing Duke. I saw Duke lean back, so I've always, I had my assumption as to what caused him to lean back, but I wasn't where I could perfectly see what happened, but I saw him lean back, Duke slapped him, Roch ended up hitting him, I missed some of it because I ran to hit the buzzer to get help out there so that they could get somebody to break this up because it had obviously escalated and then by the time I turned back from the buzzer to buzz the office Duke's on the ground and getting kicked.

Q: By Mr. Bordelon?

A: By Mr. Bordelon.

Q: More than one kick?

A: More than one kick, I did count two, but as far as if anything happened prior to that because one minute he was there, next minute he was on the ground in the fetal position. So what exactly took place while I was headed to the buzzer and coming back, trying to keep my kids in the room.

Q: When you went to punch the buzzer for the intercom and report this and when you came back Mr. Allgood was in the, you said the fetal position?

A: He was in the fetal position trying...

Q: He was curled up on the ground?

A: He was curled up on his side, he was curled up on the sidewalk, he was laying down on the ground and had been kicked.

Q: Did you see Mr. Bordelon kick Mr. Duke after he was in this position?

A: Yes, those were the two kicks that I saw.

9

Q: Twice, there could have been more you just didn't seek [sic] them?

A: There could have been more I didn't see it, my back was to it.

Q: So from your vantage point was Mr. Allgood defenseless?

A: He was very defenseless and in fact two of my students left the room to break it up, they didn't want...they verbally said "Ms. Hukins, someone has to do something, he's getting beat up".
. . . .

Q: Did you ever see, after you hit the buzzer, did you ever see any effort by Mr. Allgood to swing or hit or punch or kick Mr. Bordelon?

A: The only thing I saw was the one slap which was after the lean back. Whatever the lean back was, I saw the one slap in the face and then it was haywire from that and he was not the aggressor at all.

Q: Now you say he leaned back, if I were to tell you that we've had testimony that Mr. Bordelon spit in principal Allgood's face would the reaction you saw be consistent with that?

A: I would say so.

Business teacher Judy Decuir's testimony of the incident corroborated that of Coach Price and Ms. Hukins, in that she recalled Bordelon hitting Mr. Allgood and kicking him while he was on the ground.

Lieutenant Gerald Augustine of the Cottonport Police Department was a student office worker at Marksville High School on the date of the incident. While Lieutenant Augustine did not witness the altercation, he was present in the office when Bordelon and Allgood were in Allgood's office. He witnessed Bordelon in an agitated state and uttering profanities. Lieutenant Augustine heard Allgood attempting to calm Bordelon down.

Assistant Principal Cindy Schaub also witnessed the events in Allgood's office. Contrary to Bordelon's characterization of the encounter, and consistent

10

with Lieutenant Augustine's account, Ms. Schaub testified to Bordelon's screaming and cursing in the office after Allgood informed him that he was suspended. She phoned police after Bordelon stormed out of the office. She did not witness the fight.

Former Marksville High student, Casey Laborde, witnessed the fight from the vantage point of teacher Judy Decuir's classroom:

> A: I was in Ms. Judy Decuir's class that afternoon when I heard yelling and foul language up the hallway and then looked out the window and saw Roch Bordelon and Mr. Allgood outside. Mr. Allgood was pursuing Roch while he was exiting the campus. When they got in the courtyard Roch turned around to coach Allgood and got in his face and was hollering at him and stuff and pushed him.
>
> . . . .
>
> Q: Now you say that they had exited the building?
>
> A: Yes, sir.
>
> Q: Now how is it that you could see that?
>
> A: Cause [sic] the way the school is made, they go out the doors and then I can see them as they get into the courtyard.
>
> Q: So you had a good line of sight into the courtyard?
>
> A: Yes, sir.
>
> Q: And then tell me what you saw at that point and time?
>
> A: They were in the courtyard to go out the back gate when Roch turned around to Allgood, got in his face and then all of a sudden he threw him on the ground and they were fighting.
>
> Q: When you say he got in his face are you saying, when you say he, who got in who's [sic] face?
>
> A: Roch got in Allgood's face.
>
> Q: And then what happened after that?
>
> A: Roch was pointing his finger in his face and then he threw him on the ground and then they were fighting.

Q: So Roch threw principal Allgood on the ground?

A: Yes, sir.

Q: Did you see any blows or any fist being?

A: Yes, sir.

Q: And who was striking whom?

A: Roch was kicking Allgood when he was on the ground.

Q: Was he...other witnesses have described that as an in the fetal position, as a nurse do you know what that is?

A: Yes, sir.

Q: Was he in the fetal position, when I say he, was principal Allgood in the fetal position?

A: Yes, sir.

Q: And Mr. Bordelon was kicking him?

A: Yes, sir.

Q: How many times did you see Mr. Bordelon kick principal Allgood while he was in the fetal position on the ground?

A: About two or three.

Q: Was principal Allgood in any position to defend himself ?

A: No, sir.

Allgood's testimony was very consistent with the descriptions given by the disinterested witnesses. After meeting with Allgood in his office, Bordelon stormed out. Allgood followed Bordelon because he was concerned that an unstable individual was on the premises. As he was exiting the building, Bordelon was spewing profanities toward Allgood and the school. After the pair exited the building, Allgood attempted to engage Bordelon to calm him. Bordelon insulted Allgood, stating that he lacked the manhood to oppose the superintendent over the

12

decision to suspend Bordelon. Allgood then told Bordelon that he was fired. Bordelon spat in Allgood's face, and Allgood struck him. The melee ensued. Bordelon got Allgood on the ground and kicked him.

Under the manifest error rule, and especially when the finder of fact's determinations are based upon evaluations of credibility, "*reasonable evaluations of credibility and reasonable inferences* of fact should not be disturbed upon review, even where the appellate court feels that its own evaluations and inferences are as reasonable." *Blackman v. Brookshire Grocery Co.*, 07-348, p. 2 (La.App. 3 Cir. 10/3/07), 966 So.2d 1185, 1187 (emphasis added). The testimony of Bordelon regarding the incident is so at odds with that of every other witness that we conclude that it was not reasonable for his account to have been given credence. Bordelon was obviously interested in minimizing his part in this matter; further, by his own admission, Bordelon was not in a rational frame of mind before, during, or after the events in question. We find that the jury committed manifest error in finding Allgood 60% at fault in this incident.

When a court of appeal finds that a jury committed manifest error in the allocation of fault, it may adjust the allocation "only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion." *Clement v. Frey*, 95-1119, 95-1163, pp. 7-8 (La. 1/16/96), 666 So.2d 607, 611. Allgood was clearly provoked into slapping Bordelon. Spitting in another's face is a vile, disgusting, and demeaning battery intended to demonstrate utter contempt and dominion over that person. And even if Allgood was not justified in responding as he did, Bordelon's response grossly exceeded what the law allows in defending one's self. The law allows only the degree of force proportionate to the threat or danger with which one is faced, i.e., that which

is reasonable and necessary to prevent a violent offense. *See* La.R.S. 14:19. Accordingly, even were we to find that Allgood was not justified in slapping Bordelon—a finding we deem not necessary to make here—his response was so disproportionate to that slap that it effectively negated any fault that may otherwise have been assessed to Allgood. We therefore find that Bordelon should be assessed with 100% fault in this matter.

*Damages*

We turn now to Allgood's contention that the jury erred in awarding him no damages and erred in awarding Mrs. Allgood no damages for loss of consortium. The jury found that Bordelon committed a battery upon Allgood. It also found that the battery caused injury or damage to the plaintiffs. The jury then entered "0" as the total amount of the award to the Allgoods. The jury did not award Mr. Allgood the amount of his medical damages, even though the parties had entered a stipulation to the amount of the damages and to the fact that they were incurred "for injuries resulting from the battery committed upon him January 26, 2009." The jury's determinations that Allgood was damaged or injured by the battery, but that he was not entitled to any damages whatsoever—particularly when considered in light of the stipulation by all parties that Allgood incurred $36,642.04 in medical expenses as a result of the battery—represents an inconsistency in the verdict that we are unable to reconcile. Unlike such cases as *Dore v. Mitsui Sumitomo Ins., USA, Inc.*, 12-875 (La.App. 3 Cir. 5/22/13), 117 So.3d 231, *writ denied*, 13-1953 (La. 11/8/13), 125 So.3d 1094, in which the parties reserve the right to contest the causal relationship between a plaintiff's injuries and the medical expenses incurred,

the parties here stipulated that the medical expenses were incurred *as a result of the injuries Allgood sustained*.

A stipulation constitutes a judicial confession. *Luquette v. Allstate Ins. (Indem.) Co.*, 50,177 (La.App. 2 Cir. 8/12/15), 174 So.3d 736. "A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it. A judicial confession is indivisible and it may be revoked only on the ground of error of fact." La.Civ.Code art. 1853. Such a stipulation binds the parties and the court, and "has the effect of withdrawing a fact from issue and disposing wholly with the need for proof of that fact." *Luquette*, 174 so.3d at 746. The amount of medical specials and their causal relationship to the battery committed by Bordelon was withdrawn as an issue in the case by virtue of the stipulation. The jury erred as a matter of law in failing to award Allgood the amount of medical expenses the parties stipulated were incurred as a result of the battery. We, therefore, reverse the trial court's judgment and award Allgood past medical specials in the amount of $36,624.04, subject to a credit in favor of the Avoyelles Parish School Board for $33,811.04 it has already paid, as per the stipulation.

Allgood maintains the jury erred as a matter of law in failing to award him general damages. In *Wainwright v. Fontenot*, 99-582 (La.App. 3 Cir. 12/8/99), 750 So.2d 1077, a panel of this court held that a jury erred as a matter of law in failing to award general damages to a plaintiff to whom it awarded medical special damages. In that matter, however, the minor child on whose behalf the suit was brought had witnessed his father being burned while extinguishing a grease fire. The child began to demonstrate signs of stress and was taken to a counselor. He was prescribed Prozac, but his prescription was improperly filled. Administration

of the improper dosage resulted in the child being hospitalized for observation. At trial, the jury awarded $1,500.00 in medical expenses and nothing for general damages. This court increased the medical expense award to $7,372.00 and $40,000.00 in general damages.

The defendants sought writs from the Louisiana Supreme Court, which granted them. *Wainwright v. Fontenot*, 00-492 (La. 4/20/00), 759 So.2d 769. The supreme court reversed, noting that there does not exist a bright-line rule that awarding special damages and not general damages is legal error; rather, such awards are most often merely inconsistent awards, which represent abuses of discretion. *Wainwright v. Fontenot*, 00-492, (La. 10/17/00), 774 So. 2d 70. The supreme court then enunciated the appropriate test reviewing courts must apply:

> It may often be the case that such a verdict may not withstand review under the abuse of discretion standard. However, it would be inconsistent with the great deference afforded the factfinder by this court and our jurisprudence to state that, as a matter of law, such a verdict must always be erroneous. Rather, a reviewing court faced with a verdict such as the one before us must ask whether the jury's determination that plaintiff is entitled to certain medical expenses but not to general damages is so inconsistent as to constitute an abuse of discretion. Only after the reviewing court determines that the factfinder has abused its much discretion can that court conduct a *de novo* review of the record.

*Id.* at 76.

We find that there was a clear abuse of the jury's vast discretion in failing to award Allgood any general damages. The parties stipulated that as a result of the battery he received at Bordelon's hands (and feet), Allgood incurred considerable medical expenses, including two separate courses of physical therapy and wearing an upper-teeth splint at night and a lower-teeth splint during the day for three years. He experienced clicking and popping in his left temporomandibular joint (TMJ). He also experienced exacerbation of a pre-existing herniated L5-S1 lumbar disc.

Allgood also experienced aggravation of his neck, which had undergone surgery with fusion at several levels before this incident. This was borne out not only by the terms of the stipulation, but by the medical testimony as well.

In *Stelly v. Zurich American Insurance Company*, 11-1144 (La.App. 3 Cir. 2/1/12), 83 So.3d 1225, a panel of this court determined that an award of general damages of $20,000.00 to a plaintiff who experienced twenty-eight months of treatment for cervical injuries and TMJ dysfunction was abusively low and increased the award to the lowest amount within the trial court's discretion, $43,000.00. We, too, find that Allgood is entitled to $43,000.00 in general damages.

Allgood maintains that the jury also erred in failing to award future medical expenses despite unchallenged testimony by his treating doctors. Allgood's family physician, Dr. Kenneth T. Johnson of Pineville, Louisiana, had treated Allgood since 1986. He principally treated Allgood for hypertension, hypothyroidism, obstructive sleep apnea, and high cholesterol. After the incident, Dr. Johnson noted that Allgood began suffering from kidney problems that he related to the over-the-counter Ibuprofen Allgood had been taking. He related this to Allgood's musculoskeletal problems resulting from the battery. However, Dr. Johnson did not attribute any future medical treatment Allgood would require as a result of this kidney dysfunction. Dr. Johnson also stated that Allgood's blood pressure medicine would have to be adjusted periodically as a result of the increase in his blood pressure Allgood's physical pain would cause. However, Dr. Johnson was already treating this condition, and no attempt was made by him to quantify to any degree this pain would result in treatment Allgood was already receiving. The jury

17

was reasonable in concluding that no additional medical expenses resulted regarding either the kidney dysfunction or the high blood pressure.

Dr. James A. Pearce, a Lafayette dentist who limits his practice to the treatment of TMJ problems, also treated Allgood. He treated Allgood with a splint appliance Allgood wears over his teeth. He has not discharged Allgood, but does not see him except on an as-needed basis. At the time of his testimony, Dr. Pearce was not scheduled to see Allgood at any time in the future. Office visits with Dr. Pearce range between $70.00 and $100.00. Dr. Pearce made no attempt to quantify the frequency with which Allgood may have to return.

Dr. David A. Cavanaugh, a Shreveport neurosurgeon, had treated Allgood for two cervical disc herniations in 1998. He saw Allgood after this incident with complaints of lumbar pain. He opined that Allgood sustained aggravation of pre-existing lumbar degenerative disc disease. He treated Allgood conservatively, and ultimately referred him to Dr. Sean Stehr, an Alexandria physiatrist and pain medicine physician. Dr. Cavanaugh rendered no opinion regarding future treatment from him.

Dr. Stehr has treated Allgood since June 2013. He has prescribed Allgood Amitriptyline, an anti-depressant also used to treat neurogenic pain. Amitriptyline costs approximately $30.00 per month. Dr. Stehr also performed a lumbar epidural steroid injection that brought Allgood some relief. Allgood may need additional injections every eight months or so, at a cost of $2,500.00 to $3,000.00.

Awards of future medical expenses are highly speculative and are rarely susceptible of calculation with any mathematical certainty. *Menard v. Lafayette Ins. Co.*, 09-1869 (La. 3/16/10), 31 So.3d 996. When a victim establishes that he incurred past medical specials and that he will more probably than not incur future

medical specials, he is usually entitled to those future medical specials. *Id.* A plaintiff demonstrates the amount of medical specials through supporting medical testimony and estimations of their cost. *Id.* We award Allgood $33,000.00 in future medical expenses.

Patricia Allgood maintains that the jury erred as a matter of law in failing to award her damages for loss of consortium. The conclusion that a spouse has sustained a loss of consortium as a result of her spouse's injuries is a factual determination reviewed under the manifest error standard. *Bellard v. S. Cent. Bell Tel. Co.*, 96-1426 (La.App. 3 Cir. 8/27/97), 702 So.2d 695, *writ denied*, 97-2415 (La. 12/12/97), 704 So.2d 1202. The amount of such an award is reviewed under the abuse-of-discretion standard. *Mathews v. Dousay*, 96-858 (La.App. 3 Cir. 1/15/97), 689 So.2d 503. Here, the jury was not specifically asked on the verdict form to determine whether Patricia Allgood sustained any damage; instead, the verdict form asked, "Did the battery cause injury or damage to the plaintiffs?" The jury responded in the affirmative. Implicit in this finding is the determination that Patricia Allgood sustained some degree of loss. Accordingly, we will review the award of nothing under the abuse-of-discretion standard.

Mrs. Allgood described how her marriage had grown quite strong since she was diagnosed with cancer in her forties, and her husband was steadfast in his support of her during her treatment. Since the incident, she testified, her marital intimacy had declined significantly. Her husband had not been as supportive as otherwise might have been the case through a few family difficulties, due to his pain. He has been less diligent in maintaining the home than he was before the incident. The chemotherapy she received left Mrs. Allgood with permanent joint

19

damage, which causes her greater difficulty in performing household chores that her husband formerly performed.

In light of this, we conclude that the jury did abuse its discretion in failing to award Mrs. Allgood damages for loss of consortium. We therefore award her the lowest amount which would have been within its discretion, $10,000.00.

*Vicarious liability*

Lastly, we address Allgood's contention that the Avoyelles Parish School Board should be held liable as Bordelon's employer under La.Civ.Code art. 2320. Article 2320 has generally been construed to require that vicarious liability is imposed upon an employer only for those acts that are committed by the employee in the course and scope of his employment. *LeBrane v. Lewis*, 292 So.2d 216 (La.1974). In *LeBrane*, a hotel employee arrived for work late. His supervisor told him to take the rest of the day off and to get a haircut. The employee remained on the hotel premises after this admonition, and the supervisor fired him. While escorting the terminated employee from the premises, the supervisor got into a heated argument with the former employee and eventually stabbed him. The Louisiana Supreme Court viewed the fight as primarily employment-related, because it was "reasonably incidental to the performance of the supervisor's duties in connection with firing the recalcitrant employee and causing him to leave the place of employment." *Id.* at 218.

The same can readily be said of Bordelon's situation. He and his supervisor, who was attempting to procure him help after he engaged in a spectacle of mental instability while on school grounds, during school hours, became embroiled in a fistic encounter primarily related to Bordelon's suspension. We quite readily

20

conclude that this dispute was employment-related, and find the Avoyelles Parish School Board vicariously liable for the Allgoods' injuries.

*Costs of court*

"Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause." La.Code Civ.P. art. 1920. This article vests the trial court with discretion in awarding costs equitably. *Davis v. State ex rel. Dep't of Transp. & Dev.*, 11-625 (La.App. 3 Cir. 11/2/11), 78 So.3d 190, *writ denied*, 11-2681 (La. 2/10/12), 80 So.3d 488. The trial court assessed all costs to plaintiffs. That judgment was predicated upon the verdict of the jury, which we have already concluded and demonstrated was eminently flawed. Accordingly, assessing costs against the plaintiffs in this matter likewise constitutes an abuse of discretion. All costs are to be borne by the defendants/appellees, including expert witness fees.

*JNOV*

Our decision herein renders the plaintiffs/appellants' assignment of error regarding the trial court's refusal to grant them a JNOV or new trial moot.

## CONCLUSION AND DECREE

The jury manifestly erred in its allocation of fault. Assuming that Allgood was not justified in striking Bordelon after Bordelon spat in his face, Bordelon's response was grossly disproportionate to any provocation Allgood may have provided. We find Bordelon should have been assessed 100% fault in the matter. The jury abused its discretion in failing to award Allgood general and special damages. It also abused its discretion in failing to award Patricia Allgood damages for loss of consortium. Therefore, we reverse the trial court and award damages to

21

plaintiffs/appellants, Stephan Michael "Duke" Allgood and Patricia Allgood, as follows:

Past medical special damages of $36,624.04, subject to a credit in favor of defendant/appellee, Avoyelles Parish School Board, of $33,811.04; general damages to Stephen Michael "Duke" Allgood of $43,000.00; future medical special damages of $33,000.00; loss of consortium damages in favor of Patricia Allgood of $10,000.00. We reverse the trial court's determination that defendant/appellee Roch Bordelon was not acting within the course and scope of his employment. The dispute occurred within the bounds of the school during school hours and was primarily related to the superintendent's decision to place Bordelon on administrative suspension. Finally, we reverse the trial court's assessment of all trial court costs to plaintiffs/ appellants. All costs of this appeal and all costs in the trial court are taxed to defendants/appellees, Roch Bordelon and the Avoyelles Parish School Board.

**REVERSED AND RENDERED.**