McDonald, j.
| ?In this appeal, plaintiffs in a medical malpractice suit appeal from a judgment awarding medical expenses but no general damages. We reverse the judgment in part and render.
FACTUAL AND PROCEDURAL BACKGROUND
In 2003, 37-year-old Kimberly Thibo-deaux became pregnant with her fourth child and saw Dr. James Donnell as her obstetrician-gynecologist. In mid-November, at about 29 weeks pregnant, Mrs. Thibodeaux was hospitalized for four days at Terrebonne General Medical Center (TGMC) in Houma, Louisiana, for vaginal bleeding secondary to placenta previa. On November 18, upon Dr. Donnell’s referral, she consulted Dr. Douglas M. Montgomery, a maternal/fetal medicine specialist who handled high risk pregnancies. He recommended rest, limited activity, and delivery of Mrs. Thibodeaux’s child at 36-37 weeks gestation, depending on follow-up testing. The next day, November 19, Mrs. Thibodeaux returned to TGMC with renewed vaginal bleeding and contractions. In the early morning hours of November 20, Dr. Donnell delivered Gabrielle Thibo-deaux, a baby girl, via cesarean section, and her care was transferred to an attending neonatologist.
After the baby’s delivery, Dr. Donnell was unable to remove the placenta from Mrs. Thibodeaux’s lower uterine segment and encountered vigorous bleeding. He decided to perform an emergency hysterectomy, which entailed removal of Mrs. Thibodeaux’s uterus and cervix. After completing the hysterectomy, Dr. Donnell discovered a large laceration to Mrs. Thi-bodeaux’s bladder, which he noted as about eight inches. He considered a uro-logic consultation due to the size of the laceration, but upon further consideration, he ended up repairing it himself. After completing the surgery, Dr. Donnell ordered a post-operative intravenous pyelo-gram (IVP) to determine if the bladder repair was successful. While waiting for these results, Mrs. Thibodeaux had extreme abdominal pain and was producing little urine. About three to four hours after the cesarean section/hysterectomy, the IVP revealed that Dr. Donnell’s bladder repair sutures were obstructing Mrs. Thibodeaux’s ureters, the tubes that drain urine from the kidney into the bladder.
|sDr. Donnell then consulted Dr. Robert Alexander, a urologist, who performed a cystoscopy and confirmed that Mrs. Thibo-deaux’s ureters were indeed obstructed by Dr. Donnell’s sutures. Around midday on November 20, Dr. Alexander reopened Mrs. Thibodeaux’s abdomen, removed Dr. Donnell’s bladder sutures, freeing the ureters, and re-repaired the bladder laceration, which included the removal of dead tissue. Dr. Alexander also inserted a su-prapubic catheter in Mrs. Thibodeaux’s bladder and stents into her ureters to facilitate urine drainage from the kidneys to the bladder. Mrs. Thibodeaux remained hospitalized until November 25.
Mrs. Thibodeaux followed up with Dr. Alexander within the weeks after her bladder repair, undergoing separate procedures to remove the suprapubic tube and *473 ureteral stents. Although her bladder healed, she continued to see Dr. Alexander for three years with irritative bladder symptoms, including urinary frequency every 30-60 minutes, urgency, urine leakage, painful urination (dysuria), painful sexual intercourse (dyspareunia), urination during sexual intercourse, excessive nighttime urination (nocturia), and abdominal pain with spasms. In late April 2004, about five months after the incident, Dr. Alexander performed a cystoscopy on Mrs. Thibo-deaux and unsuccessfully attempted to distend her bladder. He determined ■ her bladder had a capacity of only 300-350 cubic centimeters (ccs), less than the average bladder capacity of 400-500 ccs for a person of Mrs. Thibodeaux’s size. He diagnosed her with interstitial cystitis, also known as painful bladder syndrome, and prescribed medications, none of which relieved Mrs. Thibodeaux’s symptoms. She continued to have considerable bladder problems, and she last saw Dr. Alexander in September 2007, when he performed another cystoscopy and again unsuccessfully attempted to distend her bladder, which he determined then had a “very small capacity” of only 250 ccs. According to Dr. Alexander, Mrs. Thibodeaux’s diminished bladder capacity is a permanent condition.
Mrs. Thibodeaux and her husband, Todd, filed a request for medical review in November 2004, but for reasons not apparent the medical review panel expired before an opinion was issued. In October 2006, Mr. and Mrs. Thibodeaux filed this medical malpractice suit against Dr. Donnell, individually, and on behalf of their child, Gabrielle. 14The trial court dismissed the- suit as prescribed, but this Court later reversed, finding that the suit was timely filed. Thibodeaux v. Donnell, 07-1845 (LaApp. 1 Cir. 9/12/08), 994 So.2d 612. The Supreme Court affirmed this Court’s decision; Thibodeaux v. Donnell, 08-2436 (La.5/5/09), 9 So.3d 120.
The matter proceeded to a four-day jury trial in May 2014, which concluded with a jury verdict in favor of the Thibodeauxs, finding that Dr. Donnell had indeed breached the applicable standard of care in his treatment of Mrs. Thibodeaux and that his breach caused injury to her. But, the jury only awarded $60,000 for Mrs. Thibo-deaux’s medical expenses and awarded no general damages. On May 29, 2014, the trial court signed a judgment conforming to the jury verdict. Later, by judgment signed August 20, 2014, the trial court denied the Thibodeauxs’ and Dr. Donnell’s motions for judgments, notwithstanding the verdict and taxed costs against Dr. Donnell for $22,574.05. The Thibodeauxs then filed this appeal.
TIMELINESS' OF APPEAL
After the appeal was lodged, this Court issued a rule to show cause order indicating that the parties’ motions for JNOV- appeared to have been untimely filed, rendering the Thibodeauxs’ appeal also .untimely. The trial court later ordered that the appellate record be supplemented with documents showing that the motions for JNOV had been timely fax-filed; these fax-filed documents had not been included in the record originally sent to this Court. We allowed the supplementation, maintained the appeal, and reserved decision on the timeliness of the appeal for this panel. Thibodeaux v. Donnell, 15-0503 (La.App. 1 Cir. 9/21/15) (unpublished action).
Determining the timeliness of this appeal requires consideration of the delay for filing a motion for JNOV; the impact that delay has on the timely filing of a devolu-tive appeal; and the rules that must be satisfied to claim the fax-filing date of a motion as the official filing date. A devol- *474 utive appeal may be taken within 60 days of the date of mailing of the notice of the court’s .refusal to grant a timely-filed motion for. JNOV. See LSA-C.C.P. art. 2087. A motion for JNOV is timely if it has been filed not later than seven days, exclusive of legal holidays, after the clerk has mailed the notice of judgment. See LSA-C.C.P. art. 1811.
|fiThe pertinent dates .and deadlines for determining the timeliness of.this devolu-tive appeal are:
• 6/02/14 Notice of May 29th judgment mailed
• 6/11/14 Dr. Donnell fax-fíles JNOV motion
• 6/11/14 Thibodeauxs fax-file JNOV motion
• 6/11/14 Deadline for filing a motion for JNOV
• 6/13/14 Dr. Donnell files original JNOV motion and pays filing fees
• 6/16/14 Thibodeauxs file original JNOV motion and pay filing fees
• 6/20/14 Deadline for filing original motion and paying filing fees so that fax-filing date counts as the filing date
• 8/25/14 Notice of August 20th judgment denying JNOV motions mailed
• 10/17/14 Thibodeauxs file motion for devolutive appeal
• “10/24/14 Deadline for taking devolu-tive appeal
As shown, notice of the May 29th judgment was mailed on June 2nd. As such, a motion for JNOV would be timely if filed by June 11th. Both the Thibodeauxs and Dr. Donnell fax-filed their JNOV motions on June 11th. Therefore, if these motions were fax-filed in accordance with applicable law, then they were timely.
The law .governing fax-filing provides that any paper in a civil action may be filed with the court by facsimile transmission. LSA-R.S. 13:850(A). The facsimile when filed has the same force and effect as the original. Id. However, within seven days, exclusive of legal holidays, after the clerk has received the transmission, the party fax-filing the document must forward the: (1) original signed document; (2) applicable filing fee, if any; and (3) transmission fee of five dollars to the clerk. See LSA-R.S. 13:850(B). If the party seeking to fax-file fails to comply with these requirements, the fax-filing shall have no force or effect. LSA-R.S. 13:850(C). Therefore, the Thibodeauxs and Dr. Donnell were required to provide the clerk with the original signed motion and the applicable filing fees by June 20th.
The' documents supplemented into the appellate record show that the Terrebonne Parish Clerk of Court received the Thibo-deauxs’ original signed' motion and filing fees on June 16, and it received Dr. Donnell’s original signed motion and filing | afees on June 13. Thus, both JNOV motions were timely, and the Thibodeauxs had 60 days from mailing of the notice of the denial of the timely motions to take their devolutive appeal. Notice of the denial of these ’judgments was mailed on August 25, giving the Thibodeauxs until October 24 to take their devolutive appeal. As they filed their motion for devolutive appeal on October 17, the appeal was timely and is properly before us. We now turn to the merits of the appeal.
GENERAL DAMAGES
On appeal, the Thibodeauxs contend the jury abused its discretion by awarding special damages, but failing to award general damages to them, after rendering a verdict finding that Dr. Donnell breached the applicable standard of care. They also challenge the trial court’s denial of their motion for JNOV as to general damages.
*475 Generally, a jury has much discretion in the assessment of general damages. LSA-C.C. art. 2324.1. But, when a jury has awarded special damages but has declined to award general damages, the reviewing court must determine whether the jury’s finding is so inconsistent as to constitute an abuse.of its much discretion. Green v. K-Mart Corp., 03-2495 (La.5/25/04), 874 So.2d 838, 843-44. A trier of fact abuses its discretion in failing to award general damages when it finds that a plaintiff has suffered injuries causally related to the accident that required medical attention. Cheramie v. Horst, 637 So.2d 720, 722 (La.App. 1 Cir.1994); Stewart v. Haley, 11-0584 (La.App. 1 Cir. 11/9/11), 2011 WL 5415175, *3 (unpublished). (Contrast Wainwright v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70, where the Supreme Court held that a jury does not abuse its discretion in awarding medical expenses but no general damages when the medical expenses were incurred only to determine whether injuries were in fact sustained.)
Here, as shown by its answers on the verdict form, the jury specifically found that Dr. Donnell breached the applicable standard of care in Mrs. Thibo-deaux’s treatment and that his breach caused injury to her. The jury’s award of only $60,000 in medical expenses suggests that the jury did not believe that, all of Mrs. Thibodeaux’s mental or- physical pain and suffering, discomfort, inconvenience, emotional trauma, or other losses of lifestyle following the failed bladder, repair were causally related to Dr. |7Ponnell’s malpractice. We note that there is a reasonable factual basis in the record to support both of these jury findings regarding causation — that is, the Thibodeauxs’ expert evidence supports a finding that Dr. Donnell’s failed bladder repair caused injury to Mrs. Thibodeaux,[1] and Dr. Donnell’s expert evidence supports a finding that many of her symptoms are caused by interstitial cystitis and are unrelated to' the failed bladder repair. But, after finding that Mrs. Thibodeaux suffered some injuries causally related to Dr. Donnell’s failed bladder repair and that those injuries required medical attention, the jury abused its discretion in failing to award Mrs. Thi-bodeaux some amount of general damages. See Green, 874 So.2d at 844; Harris v. Delta Dev. Ptrshp., 07-2418 (La.App. 1 Cir. 8/21/08), 994 So.2d 69, 83; Stewart, 2011 WL 5415175 *3.
The issue becomes, then, to what extent were Mrs. Thibodeaux’s injuries causally related to Dr. Donnell’s failed bladder repair and what is the lowest amount of general damages associated with those injuries reasonably within the jury’s discretion. See Leighow v. Crump, 06-0642 (La.App. 1 Cir. 3/23/07), 960 So.2d 122, 129, writs denied, 07-1195, 07-1218 (La.9/21/07), 964 So.2d 337, 341, citing Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1977) (noting the reviewing court’s proper role on review of an inadequate general damages award due to a jury’s abuse of discretion). Once the *476 reviewing court determines the factfinder has abused its much discretion, it conducts a de novo review of the record and renders an appropriate award. Harris, 994 So.2d at 83.
General damages involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. The primary objective of general damages is to restore the party in as near a fashion as possible to the state he or she |swas in at the time immediately preceding injury. Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that .accompanies an injury. The élements of physical pain and suffering and associated mental anguish are conceptually related and, to a large extent overlapping; thus, they are difficult to precisely distinguish. Accordingly, in correcting the -jury’s abuse of discretion, we choose, to make one undifferentiated award of general damages. See Harris, 994 So.2d at 83-84; Stewart, 2011 WL 5415175 *6.
The medical evidence in this case establishes that Dr. Donnell’s failed bladder repair caused some of Mrs. Thibodeaux’s physical injuries. In the hours following the failed bladder repair, Mrs. Thibodeaux underwent IVP testing, was unable to void urine, and experienced extreme abdominal pain. ' Hours later, Dr; Alexander, the urologist, was then required to perform an exploratory cystoscopy and a second abdominal surgery. The second surgery entailed re-entry into the bladder at a different entry point than the original repair; removal of Dr. Donnell’s repair sutures that were obstructing the ureters and causing the kidney not to properly drain; removal of an “isthmus” of dead tissue that had been caught in the sutures; re-repair of the bladder laceration; and insertion of a suprapubic catheter and ureteral stents. According to Dr. Fred Duboe, the Thibo-deauxs’ obstetrical-gynecological expert, the second surgery necessarily would have been avoided had Dr. Donnell consulted a urologist rather than making the bladder repair himself. Dr. Duboe also testified that the failed bladder repair caused the dead tissue that Dr. Alexander had to remove.
After the second bladder surgery, Mrs. Thibodeaux had to return to Dr. Alexander for two follow-up procedures directly necessitated by the repairs. On December 9, 2003, Dr. Alexander removed the suprapu-bic catheter, performed a cystogram, and noted that Mr. Thibodeaux had a particularly small bladder capacity but that she was still healing. On December 17, 2003, Mrs. Thibodeaux again returned to Dr. Alexander for a cystoscopy and removal of the ureteral stents.
After these procedures, Mrs. Thibo-deaux began to experience the irritable bladder symptoms earlier described. About five months after the incident, in April 2004, Dr. Alexander performed another cystoscopy. He noted considerable scar tissue 19from the previous bladder repairs but observed that the ureters were normal and unobstructed. He diagnosed Mrs. Thibodeaux with interstitial cystitis, a condition of the bladder lining characterized by some symptoms ■ similar to hers, including excessive urinary frequency, pain related to bladder fullness, and painful intercourse. It was also during this April 2004 visit that Dr. Alexander first unsuccessfully attempted to distend Mrs. Thibo-deaux’s smaller than average bladder capacity of 300-350 ccs. Mrs. Thibodeaux continued to have irritable bladder symptoms through 2007 and medications prescribed by Dr. Alexander did not help. In September 2007, Dr. Alexander’s second *477 attempt to distend her bladder, then with only a capacity of 250 ccs, was also unsuccessful. During the 2007 procedure, Dr. Alexander again noted extensive scar tissue in the area whére the 2003 bladder repairs had been made.
At trial, Dr. Alexander testified that the cause of interstitial cystitis is unknown and is not related to bladder injury or surgery. He stated that most of his interstitial cystitis patients did not have pre-existing bladder trauma. He admitted, however, that Mrs. Thibodeaux had no irritable bladder symptoms before her 2003 bladder repair and agreed that scar tissue would cause decreased bladder capacity. He stated that her smaller bladder capacity would not change. He further admitted that Mrs. Thibodeáúx’s continuing bladder symptoms were due to a combination of her decreased bladder capacity and the interstitial cystitis. Dr. Duboe’s testimony corroborated Dr. Alexander’s opinion. He testified that Dr. Donnell’s failed bladder repair, which necessitated Dr. Alexander’s re-repair, resulted in significant scar tissue in Mrs. Thibodeaux’s bladder and “certainly contributed” to many of Mrs. Thibo-deaux’s symptoms. When specifically asked about the causal relationship between Dr. Donnell’s failed bladder repair and Mrs. Thibodeaux’s later bladder symptoms, Dr. Duboe stated that Mrs. Thibo-deaux’s reduced bladder capacity and the urinary frequency and urgency were certainly related, though he admitted that the interstitial cystitis symptoms were “not as clear.”
The evidence in the record also establishes that Dr. Donnell’s failed bladder repair caused Mrs. Thibodeaux mental and emotional damage. In April 2007, upon referral of her attorney, Mrs. Thibodeaux sought treatment from Dr. Clarence Ber-geron, a counseling psychologist. She reported to Dr. Bergeron that she was depressed [ ^because of her medical issues and because of a prior attorney’s poor handling of her malpractice suit against Dr. Donnell. During her three visits to Dr. Bergeron, Mrs. Thibodeaux described her bladder problems, including urinary frequency, excessive nighttime urination, painful intercourse, and urination' during intercourse. She also reported crying spells; having to care for two small children while on significant medications; seeking help from her grandmother to care for her children; her dislike of pain medications; attempts to isolate herself; a growing distrust of professionals; and, about her altered lifestyle Since the bladder repairs. Dr. Bergeron diagnosed Mrs. Thibodeaux with an adjustment disorder with anxious mood, explaining that her primary reaction to the recent stressors in her life was to react to “everything” with anxiousness. He noted that adjustment ■disorders usually resolve over time. At trial, Mrs. Thibodeaux explained that she discontinued treatment with Dr. Bergeron because she is a very private person and was uncomfortable discussing her life with him.
Both Mr. and Mrs. Thibodeaux also testified at trial about their altered lifestyle since the bladder repairs. Mrs. Thibodeaux testified that, before Gábr-ielle’s birth, she had no bladder problems and urinated about five or six times per day without issue. But, after the bladder repairs, she urinates 25-30 times per day, has feelings of urgency, and bouts of urinary incontinence. Her daily outings require drinking less fluids and making frequent restroom stops. Similarly, the family’s regular driving trips to visit family in Mississippi take longer because of Mrs. Thibodeaux’s required restroom stops. Also, Mrs. Thibodeaux’s recreational activities, such as fishing and hunting with her husband and daughter, *478 playing tennis, biking, shopping, and attending concerts, parades, and sporting events, have been curtailed or discontinued altogether. Further, the couple’s sex life has been, markedly affected, in terms of frequency and quality, by Mrs. Thibo-deaux’s bladder issues. Both Mr. and Mrs. Thibodeaux testified that, since the bladder repairs, they have sex much less often than before — that is, before, they had sex two or three times per week, whereas, after, they have sex, at most, twice a month. And, when they do have sex, Mrs. Thibodeaux often has pain and embarrassing urine leakage, which Mr. Thibodeaux, described as a “very tough situation.” Also, Mrs. Thibodeaux now plans for sexual encounters with, her husband by In drinking less fluids and taking pain medication ahead of tíme.,
■ After our de novo review of Mrs. Thibo-deaux’s medical records, the expert medical testimony, and the lay testimony in the record; we conclude that the Thibodeauxs indisputably proved that Dr. Donnell’s failed bladder repair caused her significant bladder scar tissue and a permanent decreased bladder capacity. In combination with her interstitial cystitis, these injuries, to some degree, are casually related to her continuing irritable bladder symptoms and to the mental and emotional damages Mrs. Thibodeaux continued to experience at the time of trial, Although the jury was free to accept Dr.. Alexander’s opipion that many of her symptoms were caused by interstitial cystitis and were unrelated to Dr. Donnell’s failed bladder repair, the jury was not free to disregard Dr. Alexander’s uncontradicted admission, as corroborated by Dr. Duboe, that her continuing bladder symptoms are due to a combination of her decreased bladder capacity and the interstitial cystitis.
Further, we also conclude that the Thi-bodeauxs indisputably proved that Dr. Donnell’s injury to Mrs. Thibodeaux also caused her general damages. Because of Dr. Donnell’s failed bladder repair, Mrs. Thibodeaux experienced significant post-surgery pain; the physical and mental pain of enduring a second bladder surgery; further damage to her bladder; the physical and mental pain and inconvenience of at least two more urologic procedures by Dr, Alexander to remove the catheter and stents needed to re-repair her bladder; and, to some degree, the inconvenience, discomfort, emotional trauma, and changes in her daily, recreational, and sexual lifestyle associated with her irritable bladder symptoms.
Considering the particular facts and circumstances of this case, the jury’s factual findings, its special damages award, and the range of general damages awards for similar injuries, and mindful that Dr. Donnell’s failed bladder repair only caused some of Mrs. Thibodeaux’s damages, we find the appropriate award of general damages to her is $50,000, the lowest amount reasonably within the jury’s discretion and consistent with the special damages award. See Posey v. Singletary, 34,913 (La.App. 2 Cir. 9/28/01), 795 So.2d 1249, 1265 (raising award from $50,000 to $100,000 for patient’s pain and suffering where she underwent numerous medical procedures for diagnosis l^and correction of physician’s admitted malpractice involving injury or obstruction of patient’s left ureter, and patient suffered significant discomfort and pain from her initial surgery until she recovered from repairs made to correct physician’s malpractice); Seagers v. Pailet, 95-52 (La.App. 5 Cir. 5/10/95), 656 So.2d 700, 712-13, writ denied, 96-2730 (La.1/6/97), 685 So.2d 117 (raising award of about $108,000 for past physical pain and suffering and for past, present, and future mental anguish and emotional distress to $150,000 to patient injured by two negligently performed surgeries; ob *479 stetrician/gyneeologist mispositioned patient’s bladder following cesarean section, causing abdominal pain, nausea, urinary-incontinence, and painful sexual intercourse until corrective surgery five years later, and interim second surgery to “fix things” did not alleviate patient’s medical problems); Jackson v. University Hosp., 00-2535 (La.App. 4 Cir. 2/6/02), 809 So.2d 1145, writ denied, 02-0553 (La.4/26/02), 814 So.2d 567 (affirming $150,000 physical pain and suffering award to patient’s heirs for undetected severance of ureters during hysterectomy, requiring several surgical procedures, including two cystoscopies, placing nephrostrom tubes in both ureters, and placement of bilateral stents); Hondroulis v. Schuhmacher, 612 So.2d 859, 863-64 (La.App. 4 Cir.1992), writ not considered, 615 So.2d 335 (La.1993) (affirming $250,000 general damages to patient for permanent bowel and bladder dysfunction resulting from surgery to which she did not consent).
Loss of Consortium, Service, and Society
The Thibodeauxs also appealed the jury’s failure to award loss of consortium, service, and society damages to Mr. Thibo-deaux and to their daughter, Gabrielle. In its answers on the verdict form, although the jury specifically found that Dr. Donnell’s breach of the applicable standard of care did cause injury to Mrs. Thibodeaux, it' also specifically found that his breach did not cause a loss of consortium to Mr. Thibodeaux or Gabrielle Thibodeaux.
The spouse and children of an injured person may recover damages for loss of consortium, service, and society; the claim is a derivative claim for damages flowing from the relationship between the claimant and the primary tort victim. See LSA-C.C. art. 2315(B); Allemand v. Discovery Homes, Inc., 09-1565 (La.App. 1 Cir. 5/28/10), 38 So.3d 1183, 1187-88. The elements of loss of consortium damages Include such pecuniary elements as loss of material sendees and support, and such nonpecuniary components as loss of love, companionship, affection, aid and assistance, society, sexual relations, comfort, solace, and felicity. The elements of a child’s claim for loss of service and, society are .essentially the same as those of the injured person’s spouse without, of course, the sexual component of spousal consortium, Jenkins v. State ex rel. Dep’t. of Transp. and Dev., 06-1804 (La.App. 1 Cir. 8/19/08), 993 So.2d 749, 777, writ denied, 08-2471 (La.12/19/08), 996 So.2d 1133. Proof of.any one of these components is sufficient for a consortium award. Broussard v. Razden, 98-2576 (La.App. 1 Cir. 12/28/99), 763 So.2d 644, 655. A claimant’s entitlement to loss of consortium damages is a factual determination subject to the manifest error standard of review, whereas the amount of such an award issubject to the abuse of discretion standard. Id.; Sarhan v. Florists Mut. Ins. Co., 08-0840 (La.App. 1 Cir. 5/13/09), 2009 WL 1331456 *8 (unpublished), writs denied, 09-1333, 09-1309 (La.9/25/09), 18 So.3d 71, 74; see Allgood v. Bordelon, 15-504 (La.App. 3 Cir. 12/9/15), 185 So.3d 26, 36.
Given the medical and lay evidence in this case, we find the jury manifestly erred in finding.that Dr. Donnell’s failed bladder repair caused no damages to Mr. Thibodeaux and Gabrielle Thibodeaux. See Brungart v. K-Mart Corp., 95-0708 (La.App. 1 Cir. 2/23/96), 668 So.2d 1335, 1342, writ denied, 96-0763 (La.5/3/96), 672 So.2d 686; Howard v. United Services Auto. Ass’n., 14-1429 (La.App. 1 Cir. 7/22/15), 180 So.3d 384, 397, writ denied, 15-1595 (La.10/30/15), 179 So.3d 615. Mr, Thibodeaux testified at trial that his relationship with his wife was “great” but that their lives had .changed since the bladder injury. He described that his sex life with his wife has been clearly impacted, both *480 quantitatively and qualitatively. Further, the couples’ testimony establishes that Mr. Thibodeaux no longer enjoys his wife’s companionship and society in the recreational activities' they previously enjoyed together. At the time of trial, Mr. Thibo-deaux belonged to three hunting-clubs and owned five boats, which indicate that these outdoor activities play a major role in his life. Although Mrs. Thibodeaux previously hunted from a deer stand and fished from a boat with her husband, her |ubladder issues prevented these shared activities as of the time of the trial. Mr. Thibodeaux testified that he takes Gabrielle, then eleven years old, hunting and that she had recently killed her first deer. He also takes Gabrielle fishing in the boat with him, but, due to Mrs. Thibodeaux’s bladder issues, she rarely joins them. So, Gabrielle seldom or never has enjoyed her mother’s companionship and society in these outdoor activities, or others, including sporting events arid parades.
Based on our review of the evidence, the range of general damage awards for similar injuries, and mindful that Dr. Donnell’s failed bladder repair only caused some of their damages, we find the appropriate award of damages for loss of consortium, service, and society to Mr. Thibodeaux are $15,000 and to Gabrielle are $5,000, the lowest amount reasonably within the jury’s discretion. See Lemoine v. Mike Munna, L.L.C., 13-2187 (La.App. 1 Cir. 6/6/14), 148 So.3d 205, 214 (affirming husband’s $50,000 loss of consortium award, where wife was no longer able to fully participate in family’s primary recreational activity at fishing camp, attend son’s basketball games, go out to eat, or engage in same level of sex life); Seagers, 656 So.2d at 713 (raising patient’s husband’s loss of consortium award from about $21,250 to $75,000 for five years during which sexual relationship was virtually nonexistent, emotional relationship was very strained, and his child care and housework burden increased because obstetrician/gynecologist mispositioned patient’s bladder following cesarean section, causing abdominal pain, nausea, urinary incontinence, and painful sexual intercourse until corrective surgery five years later; interim second surgery to “fix things” did not alleviate patient’s medical problems); Williams v. City of Baton Rouge, 02-0682 (La.App. 1 Cir. 3/28/03), 844 So.2d 360 (trial court awards minor daughter $8,000 after mother undergoes lumbar surgery with residual chronic pain and activity limitations); Sepulvado v. Turner, 37,912 (La.App. 2 Cir. 12/10/03), 862 So.2d 457, 462, writ denied, 04-0089 (La.3/19/04), 869 So.3d 855 (affirming jury award of $7,500 each to three minor children whose mother sustained a permanent back injury and can no longer go on family camping trips, nature walks, or attend children’s field trips).
Based upon our disposition of the merits, it is unnecessary for us to address the Thibodeauxs’ assignment of error as to the trial court’s denial of their motion for JNOV. See Leighow, 960 So.2d at 130.
CONCLUSION
The appeal from the May 29, 2014 judgment is maintained as timely. The judgment Is reversed insofar as it failed to award general damages to Kimberly Thi-bodeaux, Todd Thibodeaux, and Gabrielle Thibodeaux. We render judgment in favor of Kimberly Thibodeaux for $50,000 in general damages; in favor of Todd Thibo-deaux for $15,000 in loss of consortium, service, and society damages; and, in favor of Gabrielle Thibodeaux for $5,000 in loss of consortium, service, and society damages. Costs of this appeal are assessed to Dr. James Donnell.
*481 APPEAL MAINTAINED; REVERSED IN PART; RENDERED.

. 1 The record does not clearly establish what caused the large laceration to Mrs., Thibo-deaux’s bladder. When Dr. Donnell completed Mrs. Thibodeaux’s surgery, he told Mr. Thibodeaux that he had "nicked” Mrs. Thibo-deaux’s bladder. But, when later pathology reports indicated that Mrs. Thibodeaux had some degree of placental invasion into her uterus, Dr. Donnell identified this condition as the cause of the bladder laceration. In any event, the expert medical evidence establishes that a bladder laceration during an emergency cesarean section-hysterectomy is a known risk and an obstetrician-gynecologist’s infliction of such, under such circumstances, would not be a breach of the applicable standard of care. For clarity, we note that the breach here is not that Dr. Donnéll created the laceration but that he failed to properly repair it.